WILLIAM S. KING *vs.* WILLIAM FAIST & others.

Suffolk.    March 13, 1894. — May 28, 1894.

Present: FIELD, C. J., HOLMES, KNOWLTON, MORTON, & BARKER, JJ.

*Sale — Breach of Contract — Pleading — Evidence — Rescission.*

If a memorandum in writing is declared on as a written contract of sale, the vendee cannot maintain an action for its breach if he has not himself complied with its terms.

Proof that a written memorandum of an oral bargain does not correctly state the terms of the oral bargain will defeat an action in which the memorandum is declared on as a written contract.

No action lies upon a written contract made and delivered as a contract superseding a previous oral bargain, if the written contract has been itself superseded by the substitution of a different contract.

A person cannot, in order to show that he has a cause of action for the breach of a certain contract, prove a provision of a later and substituted contract, by which the time limited for the performance of his part of the original contract has been extended, unless he avers this provision of the new contract in his declaration, and if he declares only on the original contract he cannot rely as a cause of action upon a breach of the new agreement, as in such a case there would be a variance between the allegation and the proof.

In an action for a breach of contract where the plaintiff declares upon a contract which at the trial is found to have been superseded and modified by a later one, he cannot by an amendment of the declaration recover upon the later contract if it appears that, before the defendant was in default under the later one or had notified him of an intention not to perform it, he himself repudiated it by notifying the defendant that he would not perform it on his part, thus giving the defendant the right to rescind the contract.

By the terms of a contract for the sale and delivery of a quantity of flour, the vendor was to ship the flour specified as the vendee might direct, drawing upon him demand drafts for the flour shipped, and the vendee was to take out the flour by a certain date and to honor the drafts. A month before the time limited for withdrawing the flour the vendee wrote to the vendor, "Before we pay any more drafts we want some assurance from you that you will make good any claims on account of quality," and stated orally to the agent of the vendor that he would pay no future drafts without some guaranty to protect him in case flour should on arrival prove deficient in quality, and he returned a draft of the vendor unpaid. The vendor thereupon wrote, "We are not going to send any more flour." *Held,* that the vendor had a right to rescind the contract, the vendee having, without justification, declared his intention not to perform it; and that the letter of the vendor was an effectual rescission, and relieved him thereafter from all obligation under the contract to deliver the flour.

CONTRACT, for the failure to sell and deliver one thousand barrels of flour. Writ dated June 24, 1892.

Trial in the Superior Court, without a jury, before *Maynard,* J., who ruled that the action could be maintained and found for the plaintiff; and the defendants alleged exceptions. The material facts appear in the opinion.

*W. M. Stockbridge,* (*F. J. Hutchinson* with him,) for the defendants.

*S. L. Powers,* (*R. A. Sears* with him,) for the plaintiff.

BARKER, J. The plaintiff was a flour merchant, doing business in Boston under the name of W. S. King and Company, and the defendants were manufacturers of flour at Milwaukee, selling it in Boston through their agent, one Bronson. The plaintiff and Bronson were members of the Boston Chamber of Commerce, and their dealings were made under the usages and rules of the Chamber, according to which, on sales of flour for shipment from a mill, the purchaser's reasonable time for ordering the mill to ship, or for " ordering out " the flour, was fourteen days from the date of purchase; and shipment in fourteen days after receipt of directions at the mill constituted " prompt shipment," and in seven days, " immediate shipment."

Before February 27, 1890, the plaintiff had made purchases from the defendants, as to the last of which there was then pending a dispute, the plaintiff claiming damages for the poor quality of some flour delivered on a contract for two thousand barrels, of which two car-loads, three hundred barrels, had not yet come forward. On February 27 the plaintiff and Bronson made an oral agreement for the settlement of the dispute, and for a further purchase and sale of flour, by which the defendants sold to the plaintiff one thousand barrels of their La Rose patent flour at $4.65 per barrel, delivered at Boston points, the quality to be of standard grade fully equal to any ever received by him from them, and to be " ordered out " by him within a reasonable time and in such lots of one or more car-loads as he might require, the sale to be in full settlement of the dispute also, and the terms of payment to be either demand drafts with bills of lading " to order," meaning, as we infer from the statement of the case in the plaintiff's brief and a letter of February 28, drafts which the plaintiff should not be called upon to honor until he accepted the flour on which they were drawn; or drafts payable on examination or arrival of the flour, Bronson's decision on its inspection and test to be final; or demand drafts

for twenty-five cents per barrel less than the agreed price, the margin to be remitted as fast as each load should be received and found satisfactory; the defendants to adopt that one of the three methods which they preferred, but to select one of them, and Bronson to report to the plaintiff the method selected. A written instrument, intended by the plaintiff and Bronson to be a memorandum of this verbal agreement, was made on the same day, and was signed by Bronson and delivered by him to the plaintiff. It is in the form of a letter from Bronson to the plaintiff, beginning with the statement, " I have this day sold you for account Faist, Kraus, & Co.," and contains the terms of the oral bargain, except that the third option as to the mode of drawing against shipments was omitted from the memorandum by mistake. This instrument is set out by copy as part of the plaintiff's declaration, and his action is founded upon it as a written contract between himself and the defendants for the sale and delivery to him of one thousand barrels of flour, which he alleges that he within a reasonable time after the making of the contract ordered them to ship, and which they have, without valid reason or excuse, refused and neglected to deliver. The answer does not set up the statute of frauds, but denies the plaintiff's allegations, and alleges that after the contract was made the plaintiff notified them that he renounced and would not perform the same, and that they thereupon rescinded the contract and notified him that they would not perform its obligations.

Bronson, having on February 27 wired the defendants that he had sold the plaintiff one thousand barrels at $4.65, wrote them on the next day stating the terms of the oral bargain, and adding that, as soon as they should say which method of drawing the defendants would follow, instructions for the two car-loads not yet sent under the old contract would go forward, and instructions for the one thousand barrels would follow in due course. On March 3, the defendants in reply to this letter wrote Bronson: " Now about King's 1,000 barrels. We can't recognize any claim from W. S. King & Co., and your limit was $4.75. Will fill the order under the following conditions, which you may accept or not. No commission and leaving no margin of 25 cents per barrel, but mail you to-day

sample of our last run of patent, taken from a barrel of which we have about 1,200 barrels piled up in our warehouse, which if accept, will keep for Messrs. King & Co., provided the flour suits them. We guarantee flour all up to this sample, but won't guarantee the way you say in your favor, as any ever sent. . . . Terms the same as before, and demand draft. $\frac{1}{2}\%$ off, and flour has to be taken out inside of six weeks, or to name a day, say up to April 15th. Please see King about this, and, if he is willing to accept our conditions, will ship the flour." On receipt of this letter, Bronson showed it to the plaintiff, who at first insisted upon the terms of the oral agreement, but finally assented to the terms proposed. About March 15 a car-load of flour sent under the contract for two thousand barrels arrived at Boston and was inspected for the plaintiff by an inspector, who brought him what purported to be a sample, of poor quality. At this time the final car-load under the same contract had been shipped from the mill to Fitchburg, and, as the plaintiff was informed, on the same day with the Boston car-load. He had paid for the latter, and, assuming that it was of poor quality, on March 15 he wrote to the defendants: " We have your invoice for the Lowell car, but before we pay any more drafts we want some assurance from you that you will make good any claims on account of quality. The last car in here is, we think, very poor flour, very short and soft. We sent for sample at Beverly just in. This is very good body, and must have been made from very different stock. We find the Fitchburg car was shipped same day as Boston, so we expect trouble there, and have sent for sample. We want 1,000 bbls. of good flour on our recent purchase, and must have good flour. Shall we express a sample of this car to you ? " The draft for the car-load then in transit to Fitchburg arrived in Boston on March 16 or 17; and thereupon the plaintiff asked Bronson to give his personal guaranty to protect him in case he paid the draft and the Fitchburg car-load should be found deficient in quality. This Bronson refused to give, and on March 17 the plaintiff refused to pay the draft, and also told Bronson that he would not pay any future drafts without some guaranty to protect him in case the flour should on arrival prove deficient in quality; and the defendants, upon learning that the plaintiff

had refused to pay the draft, diverted the Fitchburg car-load, and it has never been delivered to the plaintiff. On March 18 the plaintiff wrote the defendants a letter in which, after stating that he had received a sample from the Fitchburg car " not poor enough to make any claim on," he adds : " We declined to pay your draft yesterday, because your agent, Mr. Bronson, refused to protect us on the quality of this flour if it was not right. We are rather surprised that we have not had any reply from Mr. Bronson in regard to this car to Boston. If you will kindly send us some guarantee that you will make right what flour you ship us that is not right, and let us know what proof you require, we would like to have you do so. Our Mr. King will be away for the balance of the week, and on his return we will want to order out probably a large part of the last 1,000 barrels, and wish to have something definite in regard to it during the week. If you wish for a sample of the car of flour here, which in our judgment is way off, Mr. Bronson can have samples drawn from this car any time. It still remains unsold, and we await your advice as to disposal." On March 22, the defendants acknowledged the receipt of the letters of March 15 and 18, adding: " Regarding the quality of late shipments, will say the car-load to Fitchburg and the one we forwarded the same date to Boston must have been the same flour, because it was made on the same run and taken from one pile in the warehouse, and fully as good as any previous shipments. Was more than astonished to learn that you let our draft go back unpaid. To avoid this in future, you must name us some good standing bank who guarantee us the payment of your drafts, before we can ship any more flour to you." On March 25, the plaintiff replied by a letter in which, after stating that he will forward samples of the Boston, Beverly, and Fitchburg car-loads, and suggesting that the Boston car-load was of export grade sent by the defendants' mistake, he adds: " We will give you the name of a bank if you wish and will so ship, who will guarantee payment of your drafts on arrival and examination of flour ; but we cannot pay more drafts without some guarantee as to quality, especially when you are so positive that the flour is the same, when it is so easy to see that it is not. We may not be able to send the samples to-night, but will to-morrow ; and we

trust, when you see them and give them your attention, you will acknowledge that it is as we have written about, make it good, and ship us good flour on our last purchase of 1,000 barrels; would like to order some out at once, but would like to get this matter adjusted first, and think when you see the samples you will acknowledge promptly and be ready to ship and give us certainty as to quality before making us pay in full for the flour." To this letter the defendants replied on March 29: "Your favor March 25th at hand and fully noted. In reply will say you returned our draft unpaid, which cancels all other contracts. We are not going to send any more flour." In the mean time the plaintiff had discovered that the flour shown him as a sample of the Boston car-load was not such a sample, and that the car-load was not deficient in quality, and on March 28 wrote to the defendants to that effect, and asked them to send a draft and bill of lading for that car-load. This letter was received by the defendants on March 31, and they never complied with the request made. The correspondence rested here until April 12. The price of flour in the Boston market commenced to rise in the early part of March, and continued to increase until the latter part of May. On April 12 the plaintiff wrote Bronson asking to have the one thousand barrels shipped, adding: "Directions for above were to be given before April 15th. Would like immediate shipment. If your shippers wish drafts guaranteed, I will attend to this, but it was no part of the contract." On April 21 the plaintiff wrote to the defendants asserting that, on the receipt of their letter of March 29, he had told their agent Bronson that he should insist on the fulfilment of the contract, adding: "And we now beg to say that we must insist on the shipment of the flour, and hereby demand shipment of same within fourteen (14) days from the time you received our shipping instructions, or by April 29th. The returning of the draft on former purchases has, as we understand it, nothing to do with this purchase, the terms of which we have always been ready to comply with. We beg to hand you copy of our contract; and we think your letters and telegrams to your agent fully confirm same." The copy referred to, we infer, was a copy of the memorandum of February 27, declared on by the plaintiff. To this letter the

defendants, on April 23, replied: " Your favor April 21st at hand and noted. In reply can only repeat what we wrote to you, March 29th, that we are not going to send you the flour." The flour was never sent, and the suit was commenced some two years after this final refusal.

The case was tried by the court without a jury, and the defendants, among other requests for rulings, all of which were refused, asked the court to rule that the plaintiff could not maintain the action on the pleadings. In our opinion the court should have so ruled. Treating the memorandum of February 27 as a written contract of sale under the usage, fourteen days from the date of purchase was the reasonable time within which the plaintiff must order the flour out, and he did not give the order within that period. Again, the writing was not made and delivered as a contract, but as a memorandum of an oral bargain. The pleadings raised the issue whether it was a written contract made by the defendants and delivered to the plaintiff as a contract, and upon the pleadings he was not entitled to recover upon proof that it was made and delivered as a memorandum of an oral bargain which it did not correctly state. Again, if the court found that the instrument of February 27 was made and delivered as a contract, superseding the oral bargain and conclusive as to the stipulations of the parties, the facts required a further finding that, upon the proposal of different terms by the defendants and the oral assent of the plaintiff to the new terms, the first contract was superseded and another substituted for it; and as the substituted contract was not declared on, the plaintiff could not maintain his action on the pleadings. The terms offered in the letter of March 3 are so different from those of February 27 that the only proper inference from all the facts is, that, after the plaintiff's assent to the offer of March 3, the contract so made was the only contract between the parties. That contract was for one thousand barrels of a certain lot of twelve hundred barrels of flour then piled up in the defendants' warehouse, of their then last run of patent flour, and which they were to keep for the plaintiff, if he accepted, and which they guaranteed was all up to a sample mailed on the same day, the flour to be paid for by demand drafts, one half of one per cent off, and the flour to be taken out by April 15.

The plaintiff contends that it is not clear that the terms of February 27 were declined by the defendants, and that the real situation is, that a modification of an original contract had been suggested by the defendants, and effected by his assent to the offer stated in their letter of March 3 ; and that he might declare upon the instrument of February 27 as a written contract, and under his declaration offer proof of the subsequent modification. The question of pleading here raised has not been discussed in our decisions which have dealt with the doctrine that the terms of a written contract may be varied by a subsequent oral agreement. See *Cummings* v. *Arnold,* 3 Met. 486 ; *Loring* v. *Alden,* 3 Met. 576 ; *Stearns* v. *Hall,* 9 Cush. 31 ; *Blasdell* v. *Souther,* 6 Gray, 149 ; *Kennebec Co.* v. *Augusta Ins. & Banking Co.* 6 Gray, 204 ; *Palmer* v. *Stockwell,* 9 Gray, 237 ; *Rockwood* v. *Wolcott,* 3 Allen, 458 ; *Lerned* v. *Wannemacher,* 9 Allen, 412 ; *Whittier* v. *Dana,* 10 Allen, 326 ; *Stults* v. *Newhall,* 118 Mass. 98 ; *Ballou* v. *Billings,* 136 Mass. 307 ; *Emery* v. *Boston Ins. Co.* 138 Mass. 398 ; *Rogers* v. *Rogers,* 139 Mass. 440 ; *Hastings* v. *Lovejoy,* 140 Mass. 261. Our statute is, that the declaration must state the substantial facts necessary to constitute the cause of action. Pub. Sts. c. 167, § 2, cl. 3. This is consistent with the old rule of pleading, that matters which should come more properly from the other side need not be stated, it being enough for each party to make out his own case. Com. Dig. Pleader, c. 81. 1 Chit. Pl. (14th Am. ed.) 222. If the plaintiff's case could stand solely on the instrument of February 27 as a written contract of the defendants which they had refused or failed to perform, and he was not compelled in order to show his own right of action to rely upon a subsequent modification of its terms, and so could treat the new agreement merely as a defence which must fail because it had not been performed by the defendants, (see *Whittier* v. *Dana, ubi supra,*) and was not substituted for the original, (see *Stults* v. *Newhall* and *Rogers* v. *Rogers, ubi supra,*) it would not be necessary for him to state in his declaration either the subsequent agreement or its breach ; for neither of those facts is in that case a necessary constituent of his cause of action ; and if the defendants should prove the subsequent agreement as a defence, the plaintiff could rebut that defence by proof that the new agreement was not in substitution, and that it had not

been performed, although there was no such averment in his declaration. But to show that he has a cause of action, he must prove a term of the new contract, namely, that he had until April 15 to order out the flour, and he cannot do so without having averred this necessary substantive fact in his declaration. And if he relies as a cause of action upon the defendants' breach of the new agreement, he cannot prove the new agreement if he has alleged only the original contract, as there would be a variance between his allegation and his proof.

The plaintiff contends that, even if his only right to maintain the action is upon the substituted contract, the facts upon which the controversy must ultimately be decided are now before the court, and that a new trial should be denied, and he should have judgment on the finding, upon amending his declaration. But upon the facts now before us he cannot maintain an action for the failure to deliver the one thousand barrels of flour. Before the defendants were in default under the substituted contract, or had notified him of an intention not to perform it, he himself repudiated it by notifying them that he would not perform it on his part, and thus gave them the right to rescind the contract. *Ballou* v. *Billings*, 136 Mass. 307. His conduct justified them in rescinding, and they made an effectual rescission.

Upon the plaintiff's assent to the terms proposed in the letter of March 3, the acts required to perform the contract were these. The defendants were to keep for him one thousand of the twelve hundred barrels of flour specified, and to ship it as he might direct, in car-loads, drawing upon him demand drafts at the rate of $4.65 per barrel so shipped, one half of one per cent off. The plaintiff was to take out the flour by April 15, and to honor the drafts. The first act of either party bearing on the question of a breach or rescission of the contract was the statement in the plaintiff's letter to the defendants of March 15 : " Before we pay any more drafts, we want some assurance from you that you will make good any claims on account of quality." Even if there was a possibility that more drafts would be drawn under the contract then partially performed, so that these words would refer in part to such drafts, the words must be taken to refer also to the drafts contemplated by the terms of the contract for the one thousand barrels, of which the letter

also says, "We want 1,000 bbls. of good flour on our recent purchase, and must have good flour." The next steps were the plaintiff's oral statement on March 17 to the defendants' agent, Bronson, that he would not pay any future drafts without some guaranty to protect him in case flour should on arrival prove deficient in quality, and the plaintiff's letter of March 18, which, if it did not explicitly require the defendants to send some guaranty of future shipments, did so impliedly by its language referring to the one thousand barrels and its failure to withdraw the declaration of the previous letter. In the mean time the defendants, if performing their part of the contract, had been keeping for the plaintiff since March 3 the one thousand barrels of flour, while the market rose. They had a right to treat the plaintiff's letters of March 15 and 18, and his statements of March 17 to Bronson, as declarations that he would not perform the contract as made and then subsisting, and to rescind the contract; and they in effect did this, by their letter of March 22, in which they say of his failure to pay a draft, "To avoid this in future you must name us some good standing bank who guarantee us the payment of your drafts, before we can ship any more flour to you." In reply, on March 25, the plaintiff wrote a counter proposition to give the name of a bank who would guarantee drafts if the defendants would so ship that the drafts should be payable on arrival and examination of flour, and reiterated his statement, "We cannot pay any more drafts without some guarantee as to quality." Upon the receipt of this letter the defendants wrote unconditionally, "We are not going to send any more flour." It is true that they stated also in the same letter, "You returned our draft unpaid, which cancels all other contracts," a statement which, considered as a proposition of law, was no doubt erroneous; but they do not make that statement in such a way as to confine themselves to it as their only justification for refusing to send more flour. See *Wright's case*, L. R. 7 Ch. 55.

In our opinion they had the right on March 29 to rescind the contract, because the plaintiff had without justification stated to them, and had more than once repeated, his intention not to perform it; and the letter of March 29 was an effectual rescission, and thereafter they were relieved from all obligations to deliver the flour. *Exceptions sustained.*