The negligence complained of was: First, that the defendant had kept on its premises a large and unlawful quantity of gasoline, and stored the same in an unlawful manner, contrary to the ordinance of the city of Greensboro; second, that it kept no watchman upon its premises; third, that it violated section 412 of the ordinances of Greensboro; fourth, that it permitted gasoline in large quantities to flow freely upon the streets and sidewalks of the city of Greensboro, where it could be easily, and was, ignited. That as a result of such negligence, inflammable vapors exploded at about 7 o'clock a.m. on 3 May, 1919, and that such explosion was so great as to wreck and ruin the plaintiff's dwelling, and many others. *Page 548 
Some of the material parts of the evidence in this case, upon which the verdict of the jury is based, are as follows:
1. Over 30,000 gallons of gasoline were stored on defendant's premises inside the corporate limits of the city of Greensboro, in a populous community.
2. A warehouse used to fill metal drums of 50 or 60 gallon capacity with gasoline.
3. Red coloring matter kept in warehouse or basement.
4. A large stream of red-colored gasoline flowing from such basement into Lithia Street.
5. Trains passing within 30 feet of warehouse, and over gasoline.
6. Gasoline fumes will explode from flame or sparks.
7. Explosion in warehouse — flame at same time in warehouse and street, where gasoline was seen.
8. Two metal drums used for gasoline were found in the ruins — head blown out of one of them.
9. No watchman was kept on defendant's premises.
10. Violation of city ordinance of Greensboro, in storing and keeping gasoline — conveyed into house by pressure, etc.
11. Gasoline at ordinary temperature gives off an inflammable and explosive vapor, and it occurred in this instance, causing the explosion.
The case was tried and submitted to the jury upon the theory of negligence, and the burden of proving actionable negligence was put upon the plaintiff. It developed on the trial that the defendant established, operated, and maintained upon its premises certain unlawful structures, wherein gasoline and kerosene in large quantities were stored, and was liable to the plaintiff for the injury resulting therefrom. On 3 May, 1919, the defendant's plant was located inside the corporate limits of the city of Greensboro, at the intersection of Lee and Lithia streets. It was bounded on the south by Lee Street, on the west by Lithia Street, and on the north by the double tracks and sidetracks of the North Carolina and Southern Railroads, and on the east by dwellings, built on comparatively small lots, the plaintiff's lot being the next lot east of the defendant's premises and fifty (50) feet from the east line thereof. The plant was located in a populous section of the city and about two hundred (200) feet from the State Normal and Industrial College, a large educational institution inhabited by many people. Lithia Street slopes to the north and passes under the tracks of the above named railroads, it being the main line of the Southern Railroad, and a large number of trains pass and repass the defendant's premises each day.
The defendant used its premises as a storage plant for gasoline and other products, which it sold at wholesale. It had thereon a warehouse, *Page 549 
under which there was a large basement, pumphouse, shed, and three large tanks, a vertical tank with a capacity of 60,000 gallons used for the purpose of storing gasoline, and two horizontal tanks, each with a capacity of 15,000 gallons, one of which was used for the storage of gasoline, and the other for kerosene. The warehouse was on the northwest corner of the lot, and its north platform was even with the railroad siding. This warehouse was used for the storage of barreled goods and metal drums were filled in the warehouse for shipment, the metal drums holding from 50 to 60 gallons of gasoline. The two horizontal tanks were just south of the warehouse and were elevated some four or five feet above the ground. The vertical tank was east of the warehouse and stood some distance above the ground. The gasoline was conveyed to a vent in the warehouse from the storage tanks above mentioned by pipe-lines, and was forced into the warehouse by pressure. Gasoline could also be taken from the horizontal tanks by truck, there being a vent in the front of such horizontal tanks. There was a drain from the basement of the warehouse that emptied on Lithia Street at a point about 15 feet from the railroad embankment.
At the time above mentioned, there was an explosion in the warehouse of the defendant company. The plaintiff was standing in his kitchen at the time, and on looking around saw the main storage-house explode and burst into flames. He saw pieces of scantling and paper roofing falling in every direction. Some of the weatherboarding of the warehouse fell in his garden, pieces of it being ten and twelve feet long. The explosion wrecked the plaintiff's dwelling by shattering the window glasses, knocking the plastering from the walls and twisting and bending the timbers of his house as described in the record. He also observed that there were flames on Lithia Street in the gutter, or side ditch, and by the curbstone. After the fire was over, he saw two metal drums in the ruins of the same kind as those in which they kept gasoline. These were in the cellar to what had been the warehouse. One drum had the head blown out. On the same day, after the fire had subsided, he saw the defendant fill one of its truck-cars with gasoline. The truck-car held about one hundred (100) gallons of gasoline, and was filled from one of the horizontal tanks. There were about 30,000 to 40,000 gallons of gasoline in the vertical tank. Just prior to the explosion six witnesses saw a large quantity of gasoline flowing from a little drain pipe leading from the north west corner of the defendant's warehouse, at a point about ten or fifteen feet from the railroad embankment. This stream of gasoline was 24 to 30 inches wide in some places, and averaged a width of 12 inches and a depth of one inch. It had run down in the gutter on Lithia Street, a distance of about 75 or 80 feet, and was breaking its way along. It had a red color. After the fire was over, Mr. Scott, the *Page 550 
deputy insurance commissioner, found a quantity of red coloring matter in the basement of the warehouse.
Gasoline at ordinary temperature gives off inflammable vapors, which contain carbon and hydrogen, and when they combine with oxygen it explodes, if it comes in contact with fire. Gasoline could become ignited. It could ignite before it reached a certain state. It could be done by a spontaneous combustion, but that is rare. Usually it has to be ignited by flame or spark of some kind. (By reference to the record in the Fox case, it will be seen that the Winston train was passing the defendant's premises just as the explosion occurred. The engine had passed, and the window-panes were broken in some of the cars. Gasoline will give off inflammable vapors, even when the temperature is below zero, according to the testimony of W. M. Allen, State Oil Chemist.
The jury, upon the evidence and under the charge of the court, returned a verdict for the plaintiff, and assessed his damages at eight hundred dollars.
Judgment upon the verdict, and defendant appealed.
after stating the case: This is one of several cases of the same kind, and was tried under the guidance of the able and learned judge who presided, upon the theory of negligence and the breach of the ordinance of Greensboro requiring that such a business as that of the defendant must be conducted under a license, which may be issued when the applicant for it has submitted to the proper city authorities its plans and specifications, and they have been approved by the board. No such thing was done by the defendant before it started in business, nor has it since been done, so far as appears in the case. The police regulations as to the erection and use of buildings and other structures for the purpose of carrying on the business of selling and distributing kerosene, gasoline, and other petroleum products is well within the governmental powers ordinarily possessed by cities and towns, as we have very recently decided. GulfRefining Co. v. McKernan, 179 N.C. 314, citing State of Missouri ex rel.Gas Co. v. Murphy, 170 U.S. 78; Reinman v. Little Rock, 237 U.S. 171;Hadacheck v. Los Angeles, 239 U.S. 394. So that it is a fact that at the time of the terrible disaster the defendant was engaged in conducting an unlawful business, because not authorized by any license to do business at all, or it was conducting the business in an unlawful manner, endangering the lives and property of the inhabitants of this growing and prosperous city, and which of these two is *Page 551 
correct, if both are not, can make no material difference. The question as to whether the violation of a statute, or ordinance, especially one intended to safeguard the citizens of a town and their property, is negligence per se, or only evidence of negligence, has been discussed extensively by this Court in several cases, but the law of this State was finally settled in Leathers v. Tobacco Co., 144 N.C. 330, where it was held that it is negligence per se, and as a matter of law, and the rule in regard to it, as stated by Judge Thompson in his treatise on Negligence (vol. 1, sec. 10), was adopted, and is substantially as follows: When the legislature of a State, or the council of a municipal corporation, having in view the promotion of the safety of the public, or of individual members of the public, commands or forbids the doing of a particular act, the general conception of the courts, and the only one that is reconcilable with reason, is that a failure to do the act commanded, or doing the act prohibited, is negligence as mere matter of law, or otherwise called negligence per se; and this, irrespective of all questions of the exercise of prudence, diligence, care, or skill. So that if it is the proximate cause of hurt or damage to another, and if that other is without contributory fault, the case is decided in his favor, and all that remains is to assess his damages. The jury, of course, must find the facts. The author expresses regret that "two or three authoritative courts" have held that the violation of a statute is only "evidence of negligence." He then proceeds to criticise the doctrine in vigorous terms. At sec. 11 he says: "If a specific duty is imposed upon any person by law or by legal authority, an action may be sustained against him by any person who is specially injured by his failure to perform that duty." Shearman and Red. Neg., 54. The author says that the action is in tort for negligence, as will appear from the language, and states that the violation of an imposed statutory duty is a sort of negligence per se. Thus, where a railroad operates its trains at a higher rate of speed than the law allows, the question whether it is guilty of negligence is not debatable. This preliminary matter the law conclusively determines against the company, and the sole question to be settled in cases of this kind is whether that delinquency is the proximate cause of the damage of which complaint is made. If it is, the negligence becomes actionable. 1 Street Foundation Legal Liability, 172. A number of illustrative cases are mentioned. The several views are stated in 21 A. And E. Enc., 478, and the cases supporting them are cited. This Court, after approving the above statement of the law, reviewed the authorities upon this question in Leathers v.Tobacco Co., supra, where it is said: "We have carefully examined a number of cases, and find that a majority of the courts have adopted the opinion of the text-writers. It is so held in Perry v. Tozer, 20 Minn. 431; CarCo. v. Armentrual, 214 Ill. 509; Billings *Page 552 v. Breinig, 45 Mich. 65." In R. R. v. Stebbing, 62 Md. 505, Alvey, C. J., speaking of a speed ordinance, says: "The ordinance is general, and is for the protection of the public generally; but the neglect or disregard of the general duty imposed for the protection of every one can never become the foundation of a mere personal right of action until the individual complaining is shown to have been placed in position that gave him particular occasion and right to insist upon the performance of the duty to him personally. The duty being due to the public, composed of individual persons, each person specially injured by the breach of duty thus imposed becomes entitled to compensation for such injury." In R. R. v. Voelker,129 Ill. 540, it is said (p. 555): "A statute commanding an act to be done creates an absolute duty to perform such an act, and the duty of performance does not depend upon, and is not controlled by, surrounding circumstances. Nonperformance of such statutory duty, resulting in injury to another, may therefore be pronounced to be negligence as a conclusion of law," citing R. R. v. Horton, 132 Ind. 189; R. R. v. Carr, 73 Ga. 557; R.R. v. Young, 81 Ga. 397; Messenger v. Pate, 42 Iowa 443; Muller v. StreetR. R., 86 Wis. 340; Hayes v. R. R., 70 Tex. 602; Tucker v. R. R., 42 La. Ann., 114; Queen v. Coal Co., 95 Tenn. 459; 49 Am. St., 935. In Salisburyv. Horchenroder, 161 Mass. 458, the evidence showed that defendant hung a sign over the sidewalk in front of his store, in violation of an ordinance of the town. It was blown down by a gale of wind, injuring plaintiff's property. Chapman, C. J., said: "If the defendant's sign had been rightfully placed where it was, the question would have been presented whether he had used reasonable care in securing it. If he had done so, the injury would have been caused, without his fault, by the extraordinary and unusual gale of wind, etc. . . . But the defendant's sign was suspended over the street in violation of a public ordinance of the city of Boston, by which he was subject to a penalty. He placed and kept it there illegally, and this illegal act of his has contributed to the plaintiff's injury." The defendant was held liable because in placing the sign over the sidewalk he violated the city ordinance, and this illegal act was held to be the proximate cause of the injury to plaintiff. It was stated to be a general rule "that the doing of a prohibited act, or the failure to perform a duty enjoined by statute or ordinance (which causes injury to another), constitutes negligence, for which the party guilty of such act or omission is liable, unless excused by the contributory negligence of the one to whose person or property it is done," citing many authorities.
To the same effect is 2 Labatt Master and Servant, 2177. He says: "By many courts it is held that a violation of such statute constitutes negligence per se." After stating the other theories, he adds: "That *Page 553 
the former of these theories is the correct one can scarcely be doubted. A doctrine, the essential effects of which is that the quality of an act which the Legislature has prescribed or forbidden, becomes an open question, upon which juries are entitled to express an opinion, would seem to be highly anomalous. The command or prohibition of a permanent body, which represents an entire community, ought, in any reasonable view, to be regarded as a final judgment upon the subject-matter, which renders it both unnecessary and improper that this question should be submitted to a jury." The latest expression of judicial thought in England corresponds with the authorities cited. In Groves v. Winborne, 2 L. R., 1898, Q. B. Div., 402,Rigby, L. J., at p. 412, says: "When an absolute duty is imposed upon a person by statute, it is not necessary, in order to make him liable for breach of that duty, to show negligence. Whether there be negligence or not, he is responsible quacunque via data for the nonperformance of the duty," if it causes damage. In New York the Court held, in the Marino case,173 N.Y. 530, upon an appeal from a judgment of nonsuit in an action by a child employed within the prohibited age for an injury sustained, that the violation of the statute was at least evidence of negligence. In Lee v.Mfg. Co., 93 N.Y. Supp., 560, Gaynor, J., in a very strong and satisfactory opinion, held that in such an action, the employment in violation of the statute was negligence per se. He reviews the Marino case, and shows that to say that such violation is "some evidence" is illogical. This case was appealed to the general term, and reversed upon the authority of the Marino case, 101 N.Y. Supp., 78. While it may not be strictly accurate to speak of the breach of duty arising out of a violation of a statutory duty as negligence, as we have seen, it is generally so treated, as entitling the injured person to an action on the case for negligence. For practical purposes, it may properly be a convenient mode of administering the right, because it involves the question of proximate cause and contributory negligence. Our precedent, Leathers v. Tobacco Co.,supra, authorized the court to submit the question in this case to the jury, so far as it concerned a breach of the ordinance, as a question of law, which is practically the same thing, as negligence per se, and the charge that, if they found, by a preponderance of the evidence, the other facts to be as the witness had testified (there being no testimony introduced by defendant), and they found that the acts of the defendant proximately caused the injury, they should answer the first issue "Yes," and proceed to assess the damages. He did this substantially, and in such a way that the defendant, at least, can have no possible objection to it. The essential facts in this respect were really not disputed. Speaking for myself, let me state that when there is a violation of a statute or ordinance, especially one of this kind, which so deeply concerns public and *Page 554 
individual safety, both as to person and property, it is an illegal act, which, of itself, is a tort, without reference to the question of negligence, and all that is necessary to make it an actionable wrong is to show damages, or in other words, that it proximately caused the injury, under the general rule that "wrong and damage" constitute a cause of action. There was no pretense in this case that defendant had complied with the ordinance, and it is almost amazing that for so long a time it should have engaged in such a dangerous and illegal business, without check or restraint of any kind, when the menace to life and property was so great. This Court, in its rulings and charge, was well within the law, and far more lenient and liberal with the defendant than its case deserved. Some authorities hold that facts such as those presented in this case establish a private nuisance, if not also a public nuisance. We will not pass upon or discuss this feature, but merely refer to a few authorities where it is considered. 11 R. C. L., p. 666; Whittemore v. Laundry Co., 52 L.R.A., (N.S.), 930, and especially the note. We said in Ridge v. High Point,176 N.C. 421: "It was a public nuisance (piling lumber in the street), as defined and understood by the law, but the court left the question of negligence to the jury, for them to find the facts, with proper instructions as to the law of negligence. It would, upon the facts, which cannot be seriously denied, appear that there was negligence on the part of both the defendants, which was the proximate cause of the death without considering the contributory negligence of the intestate, if there was any. There was a clear violation of the ordinance when the lumber was piled in Perry Street, and this was negligence per se, or, in other words, it was negligence as a matter of law, to be declared by the court, but it was not actionable negligence, as it may have resulted in no actual harm, In order to make it actionable, it was necessary to show that it was the proximate cause of the death, as the two must unite so as to become an actionable wrong." In our case, the defendant's acts were a flagrant, and even startling, breach of private and public duty. The situation was so threatening that the volatile gas set free by contact of the carbon and hydrogen with the oxygen of the air, needed only the slightest touch of fire to produce an explosion, which would almost have wrecked the city if it had extended to the quantity in the large tanks. As it was, the damage wrought was very extensive. The law will not excuse such carelessness, and even rashness, in dealing with this high explosive, which wrought havoc even in this instance. Many authorities could be cited in support of this proposition, but it is needless to review or examine them here and now. The defendant had no watchman on its premises to guard against an explosion, or to stop the leak, which he could have done easily. It is said in Shearman 
Redfield on Negligence (6 ed.), sec. 689: "The owner or controller of dangerous goods, such as gunpowder *Page 555 
and other explosives, who keeps them on his premises, does so at his own peril, and he is bound to exercise great care to prevent an injury which a prudent man would reasonably foresee might result therefrom. It is not always, however, a question of due care. Whether the keeping of gunpowder or other explosives upon private premises constitutes a nuisance depends upon the locality, the quantity, and the surrounding circumstances, without regard to the question whether it was kept carelessly or negligently. It is clear, however, that a bailee of goods, of the explosive nature of which he had no knowledge, is bound to use only ordinary care in reference to them; having used that care, he is not responsible for the consequences of an explosion." Sec. 689, supra, and notes. We also think there is evidence that if the gasoline had been handled with care, an explosion would have been avoided as it actually had been for some time, and therefore there arose a fair presumption sufficient to carry the case to the jury, that there was negligence. 1 Shearman Redfield on Negligence (6 ed.), sec. 60; Ill Central R. R. v. Phillips, 55 Ill. 194; Bahr v. Lombard,53 N.J. Law, 233 (explosion of oil pipe); Grimsley v. Hankins, 46 Fed., 400; 3 Shearman Redfield on Negligence (6 ed.), sec. 689, and notes. But caution should be taken to apply this rule according to Page v. Mfg. Co., decided at this term, as to the burden of proof. Sec. also, 1 Shearman Redfield on Negligence, sec. 58. It was held in Rudder v. Koopman Gerdes, 116 Ala. 332
: "The storing of large quantities of gunpowder and dynamite in a wooden building, located within the corporate limits of a city or town, in a thickly settled or populated portion of said city or town, and in proximity to many buildings, constitutes a nuisance, rendering the owner thereof responsible for injuries resulting from its explosion, and in an action to recover damages to plaintiff's building, resulting from the explosion of gunpowder and dynamite, a complaint, which avers that the defendant stored large quantities of dynamite and gunpowder in a wooden building in a thickly settled portion of an incorporated town, in proximity to plaintiff's building, and that the defendant's building having caught fire, the dynamite and powder stored therein exploded. with such force and violence as to cast first brands upon plaintiff's building, whereby it and its contents were set on fire, and consumed, sufficiently states a cause of action, without averring specific acts of negligence on the part of the defendants in the manner or mode of keeping the dynamite and gunpowder."Lewis v. Hughes, 12 Col., 208 (gasoline case). Watson v. Kentucky IndianaBridge and Railroad Company, 127 S.W. Reporter, p. 146, is a case much like ours, and there the Court held that "evidence in an action for damages caused by an explosion of gas generated from gasoline running from the broken valve of the derailed tank car, held to present a question for the jury as to the *Page 556 
proximate cause of plaintiff's injury." The question of proximate cause is for the jury. The Court in that case further said: "If the presence on Madison Street in the city of Louisville of the great volume of loose gas that arose from the escaping gasoline was caused by the negligence of the appellee, bridge and railroad company, it seems to us that the probable consequence of its coming in contact with fire and causing an explosion was too plain a proposition to admit doubt. Indeed, it was most probable that some one would strike a match to light a cigar or for other purposes in the midst of the gas. In our opinion, therefore, the act of one lighting or throwing a match under such circumstances cannot be said to be the only efficient cause of the explosion. It did not of itself produce the explosion, nor could it have done so without the assistance and contribution resulting from the primary negligence, if there was such negligence, on the part of the appellee, bridge and railroad company, in furnishing the presence of the gas in the street." If a third party's act cooperated with defendant's in producing the damage, defendant is liable.Grand Trunk R. Co., v. Cumings, 106 U.S. 700; Harton v. Tel. Co.,141 N.C. 455. The jury could well have found from the evidence in this case that the red gasoline ran from the defendant's warehouse by reason of its negligence, and also that it was exposed to contact with fire because of the sparks flying from the engines of the railroad companies, which were constantly passing up and down the double tracks, and on its sidings, or to the thoughtlessness or carelessness of passersby in smoking cigars, or to cigarette smokers. It does not clearly appear at what point the fire first started. To have such a place as defendant's plant unguarded in such a situation, where the gasoline ran under it, and in touch with two streets, into which gasoline could escape from its premises, was at least little short of criminal negligence. It is said in Ruling Case Law, one of the most excellent and reliable of the standard treatises, vol. 11, p. 660: "Owing to its more dangerous character, the rule is different, however, as to the storage of gasoline. Though the storage of gasoline on premises adjacent to or adjoining the premises of another be not regarded as a private nuisance per se, it may, nevertheless, become such, considering the locality, the quantity, and the surrounding circumstances, and would not necessarily depend upon the degree of care used in its storage, or upon whether every precaution that human ingenuity has conceived has been made use of in the construction of the tanks, considering the dangerous character of the substance, and its power as an explosive, of which the courts can well take judicial notice, and also considering the fact that accidents in the operation of the most perfect mechanism will occur. It cannot be said that to have a great quantity of such an agency stored within a few feet of one's dwelling-house is not sufficient to be an unreasonable interference with *Page 557 
the comfortable enjoyment of that home." The cases cited by defendant in its brief are not in point, as no statute or ordinance was violated, and there was no legal evidence of any negligence, as held by those courts, while here there are both elements. The facts fairly to be deduced from the evidence of plaintiffs show that there was palpable negligence.
In some cases the courts have found circumstances which were considered such as to make the storage of gas or oil a nuisance. Thus, it was held inO'Hare v. Nelson, 71 N.J. Eq., 161, that in a thickly built-up portion of a large city, where there are many frame buildings, the storage of large quantities of gasoline in a frame building, where it is liable to be ignited, constitutes a nuisance. So, a tank for the storage of gas, maintained in railroad yards in the heart of a city, and surrounded by buildings, constitutes a nuisance. Levin v. New York C. H. R. R. Co., 133 N.Y. Supp., 467. To deposit and keep excessive quantities of a highly inflammable and explosive substance, such as naptha, in an important section of London was held to be an indictable nuisance. Reg. v. Lister, 26 L. J. Mag. Cas. N. S., 196. Where oil stored in a tank is so located with respect to a dwelling-house as to place it in danger, and so seriously interfere with its enjoyment, it was held to be a nuisance. McGregor v.Camden, 47 W. Va. 193. In Heeg v. Licht, 80 N.Y. 579, 582, the Court, speaking of private nuisances, said: "Private nuisance is defined to be anything done to the hurt or annoyance of the lands, tenements, or hereditaments of another. 3 Bl. Com., 216. Any unwarrantable, unreasonable, or unlawful use by a person of his own property, real or personal, to the injury of another, comes within the definition stated, and renders the owner or possessor liable for all damages arising from such use. Wood Nuisances, sec. 1, and authorities cited. The causes which are regarded as private nuisances are numerous, and the books are full of decisions holding the parties answerable for the injuries which result from their being maintained. The rule is of universal application that while a man may prosecute such business as he chooses on his own premises, he has no right to erect or maintain a nuisance to the injury of an adjoining proprietor, or his neighbors, even in the pursuit of a lawful trade," citing Aldred'scase, 9 Coke, 58; Crady v. Weeks, 3 Barb., 159; Dubois v. Budlong, 15 Abb. Pr., 445; Weir's Appeal, 74 Pa., 230. A very strong view of the question of nuisance is stated by Judge Miller in Heeg v. Licht, supra, as follows: "The defendant had erected a building and stored materials therein, which from their character were liable to, and actually did, explode, causing injury to the plaintiff. The fact that the explosion took place tends to establish that the magazine was dangerous and liable to cause damage to the property of persons residing in the *Page 558 
vicinity. The locality of works of this description must depend upon the neighborhood in which they are situated. In a city, with buildings immediately contiguous and persons constantly passing, there could be no question that such an erection would be unlawful and unauthorized. An explosion under such circumstances, independent of any municipal regulations, would render the owner amenable for all damages arising therefrom. That the defendant's establishment was outside of the territorial limits of a city does not relieve the owner from responsibility or alter the case, if the dangerous erection was in close contiguity with dwelling-houses or buildings, which might be injured or destroyed in case of an explosion. The fact that the magazine was liable to such a contingency, which could not be guarded against or averted by the greatest degree of care and vigilance, evinces its dangerous character, and might in some localities render it a private nuisance. In such a case the rule which exonerates a party engaged in a lawful business, when free from negligence, has no application."
We may well conclude this opinion by referring to a case which seems to resemble this one more closely than any other, the only difference being that the case at bar contains much stronger evidence to establish a nuisance than in the cited case. It is there said: "We may grant that the storage of gasoline on premises adjacent to, or adjoining, the premises of another is not a private nuisance per se. It might, however, become such, considering the locality, the quantity, and the surrounding circumstances, and would not necessarily depend upon the degree of care used in its storage. Heeg v. Licht, supra; 29 Cyc., 1177. We may also concede that in the instant case every precaution that human ingenuity has conceived has been made use of in the construction of the tanks, as testified to by defendant's experts. Considering, however, the dangerous character of the substance, and its power as an explosive, of which, in this age of its wonderful development as a power to propel automobiles, traction engines, and airships, we can well take judicial notice, and also considering human fallibility, that accidents in the operation of the most perfect mechanism will occur, and all that it needs to change what is, when properly protected, a harmless agency, to a most dangerous explosive, is a careless person — can it be said that to have 20,000 gallons of such an agency stored within but a few feet of one's dwelling-house is not sufficient to be an unreasonable interference with the comfortable enjoyment of that home? This is a purely residence district of the city, and was such before the defendant began operating its dry-cleaning business, and it must be apparent to any fair-minded person that the location of these tanks in immediate proximity to complainant Whittemore's house would necessarily damage his property." Whittemore v. Baxter L. Co., 148 N.W. (Mich.), 437. *Page 559 
We need not discuss the maxim res ipsa loquitur any further than we already have, for it is not necessary to do so.
As to the probability of the fire reaching the liquid fluid from defendant's premises, and touching off the volatile gas produced by its contact with the air, from which it received the oxygen, there can be no dispute that the evidence permitted the inference by the jury that a spark from an engine of the railroad company caused the explosion, or live ashes dropped from the cigarette or cigar of a passerby. It would not have exploded but from some such or similar cause. That it was a permissible inference is fully decided in the cases, as to sparks falling from railroad engines and igniting the combustible material on the right of way or contiguous lands, and thereby destroying timber and other property, such asSimmons v. Lumber Co., 174 N.C. 225; Moore v. Lumber Co., 175 N.C. 205;Deppe v. R. R., 152 N.C. 79; McRainey v. R. r., 168 N.C. 572; Fitzgerald v.R. R., 141 N.C. 531; Hardy v. Lumber Co., 160 N.C. 116. We said in theSimmons case, supra. "The cause of the fire is not required to be shown by direct and positive proof, or by the testimony of an eye witness. It may, as we have seen, be inferred from circumstances, and there are many facts like this one, which cannot be established in any other way. It is true that there must be a causal connection between the fire and its supposed origin, but this may be shown by reasonable inferences from the admitted, known (or proven) facts, or otherwise presumptive evidence would be excluded. We have held proof, as to the emission of sparks from locomotive, or stationary engines, to be sufficient for the purpose of showing that a fire was started by them, where no one saw the sparks dropping on the place which was burned, for the reason that surrounding circumstances tended to prove that they were the cause of the fire, by reasonable presumption or inference. In Deppe's case, supra, where it was contended that no witness testified that he actually saw sparks emitted from the engine and fall on the lumber kiln, the Court said, that in considering this contention it must be remembered that the fire occurred during the daytime, and the brilliance of a summer's sun rendered any sparks thus emitted invisible to the human eye. That no one saw the sparks ignite the burned property was the fact in McNeill v. R. R., 167 N.C. 390, and Williams v. R. R.,140 N.C. 623, in which latter case the Court comments upon a similar contention. `No one testified that he saw the sparks fall from the engine upon the right of way,' and said in respect thereto that it is rarely that this can be shown by eyewitnesses."
The nonsuit was properly refused by the presiding judge. The evidence was ample for the consideration of the jury, and we may add, was almost as strong as it could possibly be. The defendant must have *Page 560 
had full knowledge of the facts, or, at least, should have had it, and nevertheless it introduced no testimony, and left the jury at liberty to infer that it either had no explanation or excuse to offer, or that the explosion could have been prevented by the exercise of ordinary care, and there was no alternative but to return a verdict against it. They were left to consider its silence as a damaging circumstance against it, for the facts in evidence required some sort of explanation from it, and it was not forthcoming. Its refusal to explain was a relevant and competent circumstance against it. Goodman v. Sapp, 102 N.C. 477. The result should have been expected. A party may rely upon the weakness of his adversary's proof, if he deems it safe and expedient to do so, but he takes the risk, and sometimes a great one, in taking that course. The plaintiff's testimony in this case was not only strong, but cogent and convincing. The circumstances here tended to show that the explosive gas, which had reached the flashing point, and was enveloping the stream of fluid, in its course towards the railroad, and spreading in every direction, was set off by a spark from one of the passing engines. The jury could well have drawn this inference. It was fortunate that the havoc caused by the explosion was not more extensive, considering that many residences, and a large normal college, were so close to the defendant's plant.
Here was a large plant, intended to supply the inhabitants of a flourishing city with these widely used products of petroleum, which were of a highly explosive character, when allowed to escape from their containers and become exposed to another chemical element, the oxygen of the air. That the gasoline did thus escape is beyond dispute, and yet by the exercise of the slightest care on the part of this apparently affluent company, it could have been prevented. Defendant, though, seemed to be more intent upon profits than upon safety, or upon making a small expenditure for a watchman, than upon safeguarding the people of a large city against a terrible catastrophe, involving immense loss of life and property; hence the fatality in this case, which could easily have been avoided by proper care.
Defendant was just as culpable as the gas company which permitted a live wire to dangle from one of its poles, as in Haynes v. Gas Co.,114 N.C. 203, or the railroad company which permitted live sparks to fly from its defective smokestack, or live coals to fall from its defective fire-box, as in Aycock v. R. R., 89 N.C. 321, and in many of a like kind. It plainly violated the ordinance 412 when it failed to get a license, and also when it constructed its plant contrary to their provisions.
The charge of Judge McElroy was fair, and plainly so to the defendant, and devoid of any error; it was also exceptionally lucid and strong in its statement of the law applicable to the case. *Page 561 
The exceptions of the defendant are found to be without any real merit, and we therefore affirm the judgment.
No error.