## STANDARD OIL CO. OF NEW JERSEY v. MIDGETT et al.

### No. 4702.

Circuit Court of Appeals, Fourth Circuit.

Jan. 6, 1941.

J. L. Emanuel, of Raleigh, N. C. (Pou & Emanuel, of Raleigh, N. C., on the brief), for appellant.

M. B. Simpson and John H. Hall, both of Elizabeth City, N. C., for appellees.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This appeal involves an action for damages brought by the plaintiff for the destruction by fire of his premises, which, it is alleged, was due to an explosion and fire on the premises of defendant, which spread to the buildings of the plaintiff. The jury brought in a verdict in favor of the plaintiff against the defendant, and judgment was duly entered thereon. There is no complaint on the part of defendant as to the rulings of the trial judge on the evidence. Defendant did, however, ask for an instruction by the trial judge directing a verdict for the defendant, and this was denied. The only question before us on this appeal is the correctness of the trial judge in refusing to give this instruction. Defendant does not complain of the trial judge's other instructions which appear to have been quite favorable to the defendant.

There were a number of other actions in addition to that of Midgett. In all these actions, the complaints contained identical allegations of negligence and the defendant's answers denying liability were all identical. These actions were all consolidated and tried as one, with separate issues as to the amount of damages for each plaintiff. To simplify the appeal, only the record in the Midgett case has been certified to this Court, and by stipulation, the remaining cases will abide the result of this appeal.

We therefore, must consider whether there was evidence substantial and sufficient enough to go to the jury on the question of the negligence of the defendant. In such consideration, the evidence must be viewed from the standpoint most favorable to plaintiff and the plaintiff is further entitled to every reasonable intendment and every proper inference which may legitimately be drawn from the evidence. McAtee v. Branning Manufactur-

ing Co., 166 N.C. 448, 82 S.E. 857; Sampson v. Jackson Brothers Company, 203 N. C. 413, 166 S.E. 181; Dozier v. Wood, 208 N.C. 414, 181 S.E. 336. See also Garrison v. United States, 4 Cir., 62 F.2d 41; Moore's Federal Practice 3106; 64 C.J. 407.

We think the trial judge was altogether correct in refusing to direct a verdict for the defendant. Such a ruling, we believe, can be justified in this case on either the theory of res ipsa loquitur or upon the doctrine of general negligence.

■ The doctrine of res ipsa loquitur has thus been set out: "Res ipsa loquitur. The thing itself speaks, the occurrence tells its own tale,—an expression which applies to a certain class of phenomena so probative on the issue of negligence that their occurrence is held to present a prima facie case of negligence, which, unless counter evidence is produced by the defendant tending to show his absence of negligence, justifies the jury in finding him guilty of negligence. Where that which causes an injury is under the management and control of the defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management and control use proper care, it affords reasonable evidence, in the absence of explanation, that the accident is the result of the want of care." Ballentine's Law Dictionary, p. 1129. See also 9 R.C.L. 1259; 20 R.C.L. 185; 45 C.J. 1193, 1200. This statement of the doctrine seems to be directly in line with the applicable North Carolina decisions. Fitzgerald v. Southern Ry. Co., 141 N.C. 530, 54 S.E. 391, 6 L.R. A.,N.S., 337; Stone v. Texas Co., 180 N. C. 546, 105 S.E. 425, 12 A.L.R. 1297; Newton v. Texas Co., 180 N.C. 561, 105 S.E. 433; Fox v. Texas Co., 180 N.C. 543, 105 S.E. 437; Springs v. Doll, 197 N.C. 240, 148 S.E. 251.

■ Judge Meekins charged the jury that the doctrine of res ipsa loquitur could be applied if, but only if, the jury found that the explosion in the warehouse of the defendant was prior in time to the fire. Inasmuch as the jury did so find, all that we need decide is whether there was substantial evidence in the record to support its finding. We believe that there was such evidence and we accordingly affirm the judgment in the court below.

It is significant that the witnesses who were closest to the warehouse at the time of the explosion and the fire, and whose opportunities for observation were the best, testified in no uncertain terms that the explosion came first and the fire later. Thus, Floyd Berry testified that he was one hundred and fifty feet from the warehouse at about five-thirty on the morning of September 11, 1939, the date of the explosion and the fire. He was asked: "Did the fire follow that explosion?" and answered: "Yes, sir". He further testified that prior to the time of the explosion, he observed nothing out of the way around the warehouse and no signs of any fire until after the explosion. Again, when asked: "What, if anything, did you see at the Standard Oil Company's warehouse?", he replied: "Explosion". Then, when immediately he was asked: "An explosion of what?", his answer was "Some sort of oil and afterwards was the fire". He further testified that at the time of the explosion, he saw a barrel, drum or some similar metal object blown through the roof of the warehouse. He gave evidence further to the effect that he had been at the spot from which he observed the explosion for about half an hour before the explosion, with a clear view of the warehouse, and that, during this period, he saw no sign of fire or smoke before the explosion.

Similar testimony was given by Orlando Burrus, who stated that he was about two hundred feet from the warehouse at the time of the explosion and fire. When asked "If there was any fire in that warehouse before you saw the explosion", he replied: "None that I could see". To the question: "Where did the fire first appear?" his answer was: "Right at the roof, where the barrel went through". He reiterated his previous testimony later, for on being again asked: "Did you see any sign of any fire in that building before the explosion?", his answer was: "No, sir".

These two witnesses were further corroborated by the testimony of Claude Wise, who was about two hundred and fifty feet from the warehouse at the time of the explosion and fire, and who also stated that his view of the warehouse was unobstructed. He was asked: "What, if anything, did you see at that time when you looked over there in the way of fire and smoke?" and he answered: "I didn't see anything at all". He was further asked: "You could not see inside the building, could you?", and his answer was: "Oh, if there had been fire inside the building, I could have seen the smoke". And when asked: "when you first knew of anything, you say you

heard and felt an explosion?", he replied: "Yes, sir".

Defendant's witness, L. B. Midgett, testified that shortly before the explosion and fire, he had passed in a boat within a few feet of the warehouse and that when he passed, he had not observed any fire or anything unusual about the warehouse. Another of defendant's witnesses, J. W. Smith, night policeman in the town of Manteo, testified that he had been on the premises "probably as late as a quarter-to-five o'clock" the morning of the explosion and fire and that "he saw nothing of any sort to indicate a fire". The testimony of Dr. Smith, the expert chemist introduced by plaintiff, is quite consistent with the theory that the explosion came first and the fire afterwards. He testified that a metal drum or barrel could have been blown through the roof only if there had been an explosion inside this barrel or drum, and that this could not have occurred had there been an explosion and fire outside of the drum.

It is true that defendant introduced a number of witnesses whose explanation did not entirely coincide with that of the witnesses for the plaintiff. Had the jury implicitly believed defendant's witnesses and had the jury drawn from their testimony the inferences for which defendant contends, the conclusion might have been reached that the fire in defendant's warehouse was prior in time to the explosion. It should be noted, however, that these witnesses for defendant were not in as good a position to observe the situation at and around the warehouse at the time of the explosion and fire as were the witnesses for the plaintiff. Again, for the purposes of this appeal at least, the jury must be the final judge of the credibility of the witnesses. And when there was, which we think was true here, substantial evidence to support the finding of the jury that the explosion preceded the fire, we cannot, on appeal, disturb that finding.

Quite apart from the doctrine of res ipsa loquitur, we think the refusal of the trial judge to direct a verdict in favor of the defendant, was amply warranted under the doctrine of general negligence. There was, we think, more than substantial evidence to justify a verdict by the jury in favor of the plaintiff through the application of the general negligence doctrine. There is ample testimony in the record to show that the whole set-up of defendant at Manteo was a veritable fire-trap, fraught with a high degree of potential danger to the community, if, indeed, not amounting to a common-law nuisance.

The premises of the defendant are thus described in the brief of appellant:

"The premises of the defendant fronted north and south along the west bank of Dough Creek for 80 feet and extended westward to the eastern side of Water Street 194 feet. A wharf 24 feet wide stretched along the creek bank the length of the premises. Adjoining the wharf and extending from defendant's northern property line southward approximately 58 feet was the warehouse building mentioned. * * * Then came an open space of about 8 feet, and then a small metal pumphouse approximately 14 feet by 20 feet at the extreme southern property line, which contained a pumping engine out of use for some months prior to the explosions and fire.

"The rest of defendant's property extending westward approximately 150 feet to Water Street was vacant. Across Water Street upon other property belonging to defendant were located several large bulk storage tanks containing its products. These storage tanks were connected with the edge of the dock on Dough Creek by pipes laid underground across Water Street and across defendant's premises some distance from the warehouse, and were used for the transportation of gasoline from tankers lying at the dock into the storage tanks. At the southern edge of the dock was located a gasoline pump of the type in general use at filling stations for the dispensing of gasoline into boats. The gasoline was drawn from a 500-gallon tank located on the outside of the metal pump-house.

"There were several windows in the warehouse and double 8 foot doors opening inward directly opposite each other on the wharf and street sides, and located at the ramp south of the center of the warehouse. * * * There was a clear open passageway or aisle between the doors the entire width of the warehouse. Sealed drums of gasoline were stored to the south thereof, and sealed drums of cylinder oils and containers of other products were stored to the north. The building had been wired for lights, but the wiring in the warehouse proper had been disconnected and had not been in use for many months prior to September 11, 1939. The southwest corner of the warehouse was partitioned and ceiled

for a small office. No petroleum products were kept in the office. Outside the office door on the inside of the warehouse was a receptacle for trash or waste."

The warehouse in which the explosion and fire occurred was in no way suited for the storage of oil and gasoline, even in sealed drums and containers. The building had been erected as a freight warehouse some twenty years prior to the explosion and fire. It was somewhat dilapidated, was constructed of wood and was, in itself, highly inflammable. There was testimony to show that the floor of the warehouse was constructed of wood, rather than concrete, was dirty, greasy, and was covered with the gasoline and oil that had been spilled on the wooden floor. There was evidence, too, to show that the ventilation of the warehouse was poor and that no adequate precautions had been taken either to prevent a fire or to extinguish a fire in case one should break out. Despite the existence of these conditions, the defendant employed no watchman and depended solely upon the regular policeman, who patrolled the streets of the town of Manteo.

There was evidence to indicate that, though the electric wiring in the warehouse had been disconnected, the wires had been left dangling in the warehouse. The testimony was far from clear as to just where this disconnection had been made. Attached to the warehouse, and opening into the warehouse by a large door, was the warehouse office. There was testimony to show that the electric wiring in this office and the globes were not of the type and character usually employed in any structure near which large quantities of gasoline were stored.

From the bulk storage tanks, located about one hundred and fifty feet West of the warehouse, several pipes led to the defendant's wooden dock (which was attached to the warehouse); and there was evidence to show that these pipes were leaky and that, consequently, gasoline had dripped from them on numerous occasions. Gasoline boats, with combustion engines, were constantly passing near the warehouse and dock and there appears to have been little or nothing to prevent free public access to the dock and to the outside of the warehouse. There was evidence, too, of at least one retail sale of gasoline within the warehouse shortly before the explosion and fire. The witness testified that this gasoline had been drawn by a spigot from one of the drums in the warehouse. The testimony indicated also that the metal drums of gasoline, or at least some of them, contained no gaskets and that the use of such gaskets would have materially limited the danger from explosion within the drums.

The record contained nothing to show that the defendant here had violated any statute of the State of North Carolina, or any ordinance of the town of Manteo, applicable to the storage of gasoline and similar products. It was made clear, however, that many towns in North Carolina had passed ordinances prescribing in some detail the method and manner of storing gasoline and the precautions which were required to be taken in that connection. Furthermore, there was a showing that the method employed by the defendant in storing the gasoline in its warehouse, and the practices followed by it, were far below the approved methods and practices followed in other parts of North Carolina in situations where gasoline was stored in appreciable quantity in close proximity to other buildings.

Authorities supporting a jury's verdict on the theory of general negligence, as outlined above, will be found collected in 22 Am.Jur. 602, 603; 42 A.L.R. 814. And very much in point in this connection is the case of Texas & N. O. Ry. Co. v. Bellar, 51 Tex.Civ.App. 154, 112 S.W. 323.

For the foregoing reasons, we affirm the judgment of the District Court.

Affirmed.