CONCHITA DE GOENAGA, Plaintiff, Appellant and Appellee, *v.* WEST INDIES TRADING CORPORATION and MIGUEL FRANCISCO, Defendants, Appellant the former, and Appellee the latter.

Nos. 10142, 10244.     Decided June 28, 1963.

*F. Fernández Cuyar* for appellant and appellee. *Benjamín Ortiz* for appellee. *Brown, Newsom & Córdova* for appellee and appellant.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ delivered the opinion of the Court.

Miguel Francisco was the owner of a two-story concrete building with basement and garage, known as Edificio Rosales, situated in the intersection of Fernández Juncos and Ponce de León Avenues, in Martín Peña, Santurce. He had leased it to Conchita de Goenaga for the sum of $200 a month, for a five-year term which expired on December 1, 1944. Goenaga had established therein a business for the manufacture of women's and children's garments. At the expiration of the contract, Francisco refused to extend it, agreeing only to continue the lease of the second floor and part of the first, on a month-to-month basis, for the same rental of $200 a month which Goenaga had been paying for the entire building, in order to lease the remaining part of the first floor and the basement to West Indies Trading Corporation—hereinafter called West Indies. The latter was going to devote it to establishing a factory for the manufacture of cigars and tobacco, in the fumigation of which it would use carbon bisulphide. The lease to West Indies was made for the sum of $300 a month.[1]

---

[1] The contract between West Indies and Francisco, which was executed in English, contained, among others, the following clauses:

"SECOND: .      .      .      .      .      .      .

"The upper or second story and a small portion of the ground-floor which is separated by a partition or first story, is at present leased to Mrs. Conchita Goenaga de Nido.

"THIRD: The landlord does hereby lease to the tenant, to wit, the West Indies Trading Corporation, that portion of the ground-floor, or first story, not leased to Mrs. Conchita Goenaga de Nido, the basement or cellar of the building and the two-story garage, above described subject to the following terms and conditions; to wit:

On February 26, 1946, there occurred an incipient fire in the basement of the building occupied by West Indies. Goenaga notified her lessor of such occurrence.[2] On the following June 8 there occurred an explosion in the basement,

"(a) The lease is made for an indefinite term or period; such term or period being not less than one month, and may be terminated at will by either the landlord, or the tenant at the end of any month.

"(b) The term of lease shall begin on the 26th day of December 1944, and each month shall be counted from the 26th of one month to the 25th of the next, and so on until notice is given stating the date on which the lease shall terminate.

"(c) Such notice shall be given one month in advance.

"(c) The monthly rent of the premises leased is THREE HUNDRED DOLLARS ($300.00) and shall be payable in advance at the beginning of each month.

"(d) The tenant does hereby agree to take charge of the leased premises in the condition in which they are at present and in which he finds them; he shall pay all water, light and gas rates and for any necessary repairs, and shall keep them, and, at the end of the lease, leave them in no worse condition than that in which he receives them.

"(e) The landlord shall not be responsible nor liable for any defect, hidden or otherwise, or imperfection in the leased property and no claim shall accrue or arise against him for any injury, harm, damage or inconvenience that may arise or be caused the tenant either by the elements or by the hands of man, and the tenant does hereby waive, renounce and disclaim all right to claim, demand, sue for or recover for any harm, damage, injury or inconvenience arising from defects or imperfections in the premises for any cause whatsoever, this relieving the landlord from all liability or responsibility therefor."

[2] That same day Goenaga sent, by registered mail and special delivery, the following letter:

"Dear Mr. Francisco:

A fire occurred today in West Indies Trading Corp., your lessee of the first floor, basement and garages of this building. During the short time these people have occupied this building, this is the second time a fire has occurred which, apart from the fact that it could have spread to my sewing shop and caused unrecoverable damages, has caused me disorganization and troubles which affect the same.

As you will realize, further occurrence of this situation should not be permitted since the destruction of my shop by fire would deprive me of my business for a long time and whatever I may be able to recover by insurance would not compensate for the loss of the business caused by a disaster of this kind. You will realize that this building does not meet the requirements necessary to house therein a business such as that of West Indies Trading Corp. which would at the same time protect against

followed by a fire which burned down the entire building—and the business of Goenaga—there remaining only the outside walls and some interior beams.

Goenaga brought an action for damages sustained as a result of the fire and obtained judgment against West Indies for the sum of $132,404.79, plus costs and $10,000 for attorney's fees. Miguel Francisco was released from liability. West Indies appealed to this Court from the judgment against it and Goenaga from that part which released Francisco.[3]

In her complaint Goenaga imputed negligence to West Indies, consisting in storing in the premises leased by it in that building and using continuously in its establishment substantial amounts of inflammable and explosive substances in violation of the applicable laws and regulations. She also imputed concurrent negligence to codefendant Francisco, consisting in having leased the premises to West Indies knowing that the latter would devote it to establish a factory for processing tobacco in which it would use, among other things, highly inflammable substances and explosives, and in permitting the lease to continue and that the part of the building leased to West Indies be devoted to such purpose, without said codefendant adopting any measure to prevent a disaster,

---

fire the other tenant of the building; in this case I am the one who occupies the upper floor.

I hope you will give immediate attention to this matter, for I am not willing to lose my business nor to let it be injured by causes for which I am not responsible.

Awaiting to hear from you, I remain

Very truly yours,
Conchita G. de Nido."

[3] These appeals were referred to the writer of this opinion subsequent to the date they were submitted and assigned to the original writer. The record sent up consists of 7,502 pages, which include 352 pages of judgment roll, 1,981 pages of transcript of oral and documentary evidence, etc., 4,721 pages of documentary evidence in originals, and 448 pages of briefs in Spanish and English.

notwithstanding he was notified by plaintiff of the explosions and incipient fires which had occurred in the past.

After admitting some facts of the complaint and denying others, West Indies alleged as special defenses (1) that the fire which occurred on June 8, 1946, was accidental and of casual unknown origin, that the proximate or direct cause of that fire was not due to any negligence attributable to it, and that it had always exercised in its business the care of a good father of family; (2) that assuming that the fire had occurred as a result of the ignition of the carbon bisulphide gases which defendant used for fumigating its products, the latter always exercised the measures of care recommended and recognized for the case, and that plaintiff had knowledge of the use of such chemical substances for the aforesaid purposes and voluntarily assumed all the consequent hazards of the use of such substances; and (3) that plaintiff received $16,837.08 and $5,000 of insurance for the merchandise and furniture destroyed in the fire.

After admitting some of the facts of the complaint and denying others, codefendant Francisco on his part alleged as special defenses (1) that even assuming that West Indies had been negligent, Francisco was not, and that any possible negligence of West Indies was not imputable to him; (2) that the articles or materials used and stored by West Indies in the premises occupied by the latter were not at the time of the fire, nor before, inherently inflammable or dangerous or explosives in themselves, and that Francisco had no knowledge that they were; (3) that any possible negligence of West Indies was due exclusively to the fact that the latter did not take due precautions and did not exercise due care in the use of such materials and articles, all of which it did without the knowledge of Francisco, and that he was not responsible for such negligence; and (4) that West Indies had at the time of the fire absolute and exclusive control over the premises in which the fire originated, West Indies

being the only one which knew or could know of the specific manner in which the fire originated, but Francisco did not; and that in view of the manner in which the fire occurred, the same must have been caused only through the negligence or an intentional act of West Indies in which Francisco did not intervene and for which he is not responsible, nor can they be imputed to him.

After a series of interrogatories, answers to the latter, examination of documents, and hearing of extensive oral and documentary evidence relating mainly to the question of liability, and after following the procedure which by stipulation of the parties was provided for the presentation of the evidence on the damages, the judgment already referred to and which gave rise to the appeals under consideration was rendered.

Before considering the questions raised in the extensive briefs submitted by the parties, it is necessary to refer first to the essential facts appearing from the extensive evidence on liability, according to the findings made by the trial court in that respect—without repeating those to which brief reference is made at the outset of this opinion—and then turn to examine, in the light of those facts and the issues in each appeal, the civil liability of defendants and afterwards, doing likewise, to examine the question relative to the damages.

### The Findings of Fact

#### (Liability)

"West Indies installed in the basement of the building a tobacco fumigation plant which consisted of two fumigation chambers in which the tobacco was placed, carbon bisulphide in liquid form was used, and which were hermetically closed. When the bisulphide turned into gas, it destroyed the insects which infest the tobacco. At the termination of the fumigation process, or before, if the tobacco was urgently needed for shipment, the fumigation chambers were opened and the tobacco removed in order to be packed and shipped. Owing to the great bisulphide

gas concentration which usually existed in the fumigation chambers, when the latter were opened the rest of the basement was flooded with gas making it almost impossible to be there. Some times it was necessary for the workers who worked in these tasks to wear gas masks furnished by West Indies to protect themselves, in order to be able to enter the fumigation chambers. The bisulphide gas circulated everywhere and it could be smelled in the mornings even in the first floor of the building. The fumigation of tobacco was practically a continuous process, especially in the last weeks prior to June 8, 1946. The employees worked in shifts, day and night. There was little ventilation, particularly in the evenings when the windows were closed.

"West Indies purchased carbon bisulphide in liquid form, in 550-pound drums, and stored them in the garage, with the exception of one drum which it kept continuously in use; namely, the drum from which the bisulphide was currently taken for immediate use in the fumigators. The bisulphide was taken out of this drum by means of rubber tubes and was poured into open pans which were then placed in the fumigation chamber and left there until it had completely evaporated, or until the chamber was opened, before the fumigation was completed. After the bisulphide evaporated, it turned into a highly volatile and explosive gas.

"There was an electric current installation in the basement. The bulbs for the general lighting were hanging from the ceiling by a cord. There were individual switches for each bulb, a general switch and another at the foot of the stairway. There were also regular bulbs in the fumigation chambers, and outside of those chambers there was a switch which controlled the inside bulbs, which could also be turned on and off by hand. Nowhere in the basement or in the fumigation chambers were there special bulbs or switches, or connections or installations of the kind sold and used to prevent explosions which could be produced by the effect of the heat, or of electric sparks, on explosive or inflammable gases. In contrast, some of the bulbs in the basement and in the fumigation chambers were switched on and off by West Indies employees by unscrewing the bulbs by hand from their sockets. Some times this produced sparks or electric shock to the employees, particularly when they were soaking wet with perspiration.

"The conditions around Edificio Rosales were the following: On the front or south was Fernández Juncos Avenue along which there was traffic of pedestrians, as well as of light and heavy motor vehicles of all kinds and public service buses; on the east or right, facing the building, there was an eating place or cafetín where another tenant of Francisco, named Evaristo Rivera Guadalupe, used a charcoal brazier almost daily in his food business which he placed against the wall of the basement on that side. Rivera Guadalupe also had tables and chairs for his customers or clients to eat, drink and smoke. On the north or rear of the building there was a small piece of land separating the basement from a public street which connects Fernández Juncos and Ponce de León Avenues at that place, on which space Víctor Luciano Colón had established a business for the vulcanization of automobile tires and tubes, in which he used certain irons which he heated with liquid gas lighted with matches, emitting flames and sparks until the irons were hot enough to melt the rubber; and on the west or left side facing the building there was an entrance for automobiles or trucks which were driven to the garage used for storing carbon bisulphide which was not being used.

"The conditions inside the building were as follows: One half of the building was occupied by the West Indies business and the other half by plaintiff's factory in which there worked from 75 to 90 women in sewing, manufacture of clothing and fabrics, and packing and shipping the finished products.

"Carbon bisulphide and bisulphide gas are extremely inflammable and explosive substances. Their vapors or gases may be set off by sparks, friction, flames or flashes of light. They are not inherently explosive. In sufficient concentration, bisulphide gas may set off an explosion merely by the flashing of a common electric bulb. Such gas is extremely volatile, it being almost impossible to prevent it from leaking even from within a completely closed space. For that reason fumigation operations with bisulphide gas are considered a latent hazard, unless due precautions and care are taken.

"West Indies never requested nor obtained any license from the Government of the Capital, nor from the Insular Government, nor from the Federal Government, to store and use any explosives.

"On February 26, 1946, early in the morning, there occurred an incipient fire inside the basement used by West Indies. The smoke was so thick and asphyxiating that it was necessary for the firemen, who were called hurriedly for that purpose, to wear masks in order to be able to enter. There were in the place several boxes aflame which were put out one quarter of an hour later. As a result of this incipient fire and of the thick smoke, all the employees of West Indies and of plaintiff's factory hurriedly abandoned the building alarmed. The losses sustained by West Indies as a result of this incipient fire amounted to $234.25, according to the claim made to its insurer, Hanover Fire Insurance Company. The insurance company paid that amount to West Indies, but almost immediately thereafter the policy of West Indies was cancelled before its normal expiration.

"As a result of this incipient fire plaintiff wrote to Francisco, to his insurance broker Alberto Ortiz Toro, and to the Chief of the Insular Fire Service reporting the occurrence and calling the attention of the Chief of the Insular Fire Service to the constant hazard or risk which the use of any inflammable liquid represented for the security of all the occupants of the building and of plaintiff's business. She also asked her lawyer, Carlos J. Torres, to take up the matter with the manager of the West Indies, Allan B. Block, and urge him to take proper precautions, which Torres did, to which Block answered that he did the proper thing in his business. Defendant Francisco wrote to plaintiff suggesting two ways of protecting herself against the West Indies negligence, to wit: insuring plaintiff's property for a sufficient amount to recover any loss in the event of disaster, or to let another tenant run the risk after plaintiff vacated her premises, and ended his letter by advising that if plaintiff was afraid of the negligence of the neighbor below, she should situate herself at a convenient distance from the hazardous place. Notwithstanding that letter, Francisco went to the building and spoke with Arturo Martín García, a West Indies officer, who told him when he showed him the letter from Conchita that nothing hazardous or involving danger of fire was used there, explaining that carbon bisulphide was used in all the factories of the tobacco industry. As to the letter which plaintiff wrote to the Chief of the Insular Fire Service, the same was not answered.

"Four months after the incipent fire, around 7:00 p.m. of June 8, 1946, there occurred in the basement of the building a huge explosion immediately followed by a fire which burned down the entire building, there remaining only the ruins of the exterior walls and some interior beams. The explosion occurred in the basement occupied by West Indies and the effects thereof were so bad that even the show windows of the building occupied by the Aqueduct Service which is situated across Edificio Rosales on Fernández Juncos Avenue were broken. All the employees of West Indies who were working at that moment had to jump out of the windows. The fire raged several hours and even the following day the materials were still burning. When the fire started it was much more intense on the right-hand side of the building, although it was very intense throughout the entire building. As a result of the heat, the Aqueduct Service building also caught fire in several places.

"The explosion occurred almost simultaneously with the act of turning on an electric switch. Pedro Carrasco Díaz, a West Indies employee, was sent to the basement from the first floor by Arturo Martín García, manager of West Indies, to get an electric bulb to be used on the first floor. The basement was dark and when Carrasco tried to turn on the switch at the foot of the stairway in order to light, the explosion ensued producing 'a blue flame of fire' which developed rapidly into a general fire. The explosion occurred in the basement, although from the evidence it does not appear clearly whether it was in the small or in the large fumigator.

"Miguel Francisco had no control over the businesses established in the building leased to plaintiff Conchita de Goenaga and to West Indies Trading Corporation, nor any intervention in the storing, preparation, packing of tobacco or cigarettes, nor any intervention or control over the fumigation process carried out by codefendant West Indies Trading Corporation.

"Likewise, Francisco had no knowledge that West Indies performed the fumigation in a negligent and careless manner, nor that up to the date of the fire object of this litigation it had failed to take all proper precautions in the process of fumigation.

"Any possible action or omission of codefendant Miguel Francisco in the case at bar was not the proximate cause of the explosion and of the fire which occurred in this case.

"The court is also convinced that carbon bisulphide is not an explosive within the meaning of that term under the Explosives Act of Puerto Rico, or under any legal concept as to explosives.

"That West Indies Trading Corporation was not bound to obtain a license or permit from agencies of the Insular or Federal Government, or the Municipal Government of San Juan, to fumigate tobacco or cigars with carbon bisulphide, and that there is no causal relation between such omission and the explosion and fire which occurred in the case at bar.

"The evidence does not warrant other reasonable interpretation as to the cause of the explosion and of the fire object of this suit than that which implies negligence on the part of defendant West Indies Trading Corporation in the causation of the explosion and of the fire.

"The court has not given credit to the evidence presented by West Indies in the sense of suggesting that the explosion was caused by the heat applied to the wall of the building by the braziers of Evaristo Rivera Guadalupe, since such theory is highly improbable."

### Appeal of West Indies

There are four grounds on which West Indies bases the challenge of the judgment rendered against it as to the question of liability. Let us examine them forthwith in the same order in which they are set out in its brief.

*First Point: "There is absolutely no evidence in this case to support the following findings of the court below:*

". . . The basement was dark and when Carrasco tried to turn on the switch at the foot of the stairway in order to light, the explosion ensued producing 'a blue flame of fire' which developed rapidly into a general fire.

".    .    .    .    .    .    .    .

". . . the basement being completely dark . . . he sent an employee who never worked in fumigation to get a bulb, and when the employee turned on the switch in order to light the basement, an explosion forthwith ensued.

".    .    .    .    .    .    .    .

". . . There were individual switches for each bulb, a general switch and another at the foot of the stairway."

■ In making the first of the three findings copied above, which is substantially supported by the deposition of the manager and also treasurer of West Indies, Arturo Martín García, as we shall presently see, the trial judge inadvertently referred therein to a "blue flame of fire." The contention of West Indies that such descriptive phrase does not appear from the evidence admitted, and that the same appears in the deposition taken to an employee of West Indies, named Pedro Carrasco, which was not offered in evidence, is correct. Both the deposition of Martín García and that of employee Carrasco were taken at the request of codefendant Francisco, at the same act, and transcribed and stitched together in the same piece by the stenographer. The deposition of Martín García was offered in evidence by West Indies, which offer of evidence was joined in by codefendant Francisco, the same having been admitted and marked *Exhibit P* of West Indies on the cover common to both depositions.

■ The inadvertence pointed out does not have the scope attributed by West Indies, since with the exception of the reference to the "blue flame" all the other points of the finding challenged appear from Martín García's deposition, on which the trial judge relied in concluding that West Indies itself had explained the origin of the explosion and fire; and, indeed, the further reference to the deposition of Pedro Carrasco made in its conclusions of law—parting from the erroneous belief, as we have seen, that that deposition had also been offered in evidence—does not defeat the basis of evidence on which the finding of fact challenged is grounded. It is imperative to cite at length from the deposition of Martín García in order to show, as to the latter as well as to other points of the challenge made by West Indies against the findings of the trial judge, that the errors assigned in

the First Point are insubstantial, since in the second finding of fact copied above the trial judge again commits another lapsus—also without consequences—in referring to Pedro Carrasco as an employee "who never worked in fumigation":

"Q. What happened that night, if you know?

A. Between 6:00 and 7:00 p.m., we were working that night because we had an urgent shipment, and when the workers started coming there was not enough light in the corner of the first floor and I sent to the basement for a bulb. I asked Pedro, a trusted employee, one of the oldest employees I have there, and I remained in the upper floor; about three or four minutes later, more or less, about two or three minutes after he went down, the fluid gas came immediately . . . .

Q. What came?

A. That smoke and I dashed through the door to give the warning.

Q. You said something about gas that was coming . . .

A. Smoke, and I called the aqueduct office, to call the firemen because something was happening. Immediately it could be seen as if the fluid which was in the fumigation room had leaked . . .

.       .       .       .       .       .       .       .

A. I sent Carrasco and I was in the very middle of the stairway. After going down four or five steps, he put out his right hand. Of course, the switch is behind the column and he could not see it at all, but he placed his hand on that place and there was light there; otherwise he could not walk down the stairway because of the darkness in that place.

Q. How long was it between the time he put out his hand and the flame?

A. A few seconds.

.       .       .       .       .       .       .       .

Q. But you say that he put his hand on the switch column?

A. Yes, sir.

Q. And after turning on the switch, did he proceed down?

A. Yes, sir.

Q. When he touched some place, did he switch on a light somewhere?

A. Yes, sir.

Q. And after proceeding down the stairway, the explosion occurred?

A. After that happened, about two seconds later.

Q. He put his hand on that column, turned on that switch, as is to be expected, and then he proceeded downstairs?

A. Yes, sir.

Q. And two or three seconds later the explosion occurred?

A. Yes, sir.

Q. And was that explosion a big one?

A. Not too big, I was standing on the side where I heard the noise.

Q. And you did not notice the odor which you noticed before at the time of the incipient fire?

A. What incipient fire?

Q. In the incipient fire of February?

A. In February there was no diffusion of gas; only smoke. In the latter I smelled it.

Q. Of the bisulphide gas?

A. Yes, sir.

.   .   .   .   .   .   .   .

Q. Which fumigator was opened there?

A. The small fumigator; I have seen it open.

Q. Who opened it?

A. The noise, the explosion.

Q. The explosion opened the door of the fumigator?

A. Yes, sir.

.   .   .   .   .   .   .   .

Q. And when the explosion broke out, did that door open up?

A. Yes, sir.

Q. So, the explosion occurred inside that fumigator and blew up the door?

A. The door opened up. After the noise sounded, I went down right away to find out what was wrong and I saw the door open and saw flame.

Q. The flame was coming out of the small fumigator?

A. Yes, sir, and I dashed out looking for Pedro.

Q. That door of the small fumigator remained open?

A. Yes, sir.

Q. And the flame came out of there?

A. Yes, sir.

Q. That flame enveloped the entire premises?

A. No.

Q. That flame did not spread rapidly at more than 40 miles?

A. Not at all because I passed in front of it.

Q. Do you not recall having testified something like that, somewhere, that the flame spread at a speed of about 40 miles?

A. I do not recall.

Q. But the door of the room where the fumigation was being carried out opened up, the door opened up and the flame came out from there?

A. Yes, sir.

Q. Before Carrasco, that you know of, had anyone gone down to the basement?

A. First a boy went down as far as the middle of the stair way, and he said to me: 'Arturo, I cannot find the switch for the stairway.'

Q. What was the name of that boy?

A. Pagán . . . I don't remember . . . That switch is behind a beam, so that when you go down you can't see it. Then I sent Pedro and Pedro went first and the boy behind him.

Q. Then Pedro turned on the switch and the explosion ensued then?

A. As he went around the stairway column.

Q. So the explosion and the flame were not simultaneous, when he put his hand on the switch, but a few seconds later?

A. Let's say about two seconds . . .

Q. Do you know what a second is? Do you realize it?

A. Yes, sir.

Q. How long have you been with the West Indies?

A. Since its foundation.

Q. Are you its treasurer?

A. Yes, sir.

Q. How long have you been treasurer?

A. Since it was founded.

Q. And also you are manager of the factory?
A. Yes, sir.

.   .   .   .   .   .   .   .

Q. Can you explain where the general light switch is located?
A. As you go down the stairway, to the right."

As to the third finding of fact challenged by West Indies in this First Point, it is well to cite from the testimony of witness Domingo Osorio the following:

"Q. Could you tell us whether there was any artificial light in the basement?
A. A large bulb, I believe 100 or 125 watts. There were five bulbs of that size.
Q. And how were they installed?
A. Fixed to the ceiling and the connecting wire also fixed to the ceiling.
Q. And how were those bulbs switched on and off?
A. By means of a switch which was on the stairway. When we went down, you turned on the switch and the bulb was lighted.
Q. How did you switch on that bulb?
A. Of those which you switch up and down.
Q. And when you turned on the switch, what happened?
A. The basement bulbs were lighted.
Q. Tell us whether each of those bulbs in the basement had an individual switch.
A. They had some small chains.
Q. What were those small chains for?
A. To switch them off; after turning off the switch, you pulled the small chain and it went off.
Q. How did you switch those bulbs on and off?
A. When we went down, we turned them on with the switch which was on the stairway, and when we finished working we switched them off with that small chain."

And from the testimony of Ángel Hernández:

"Q. Where was the bisulphide drum?
A. Underneath the stairway going up.
Q. But outside or inside the basement?
A. Inside the basement.

Q. Inside the basement and outside the fumigators?

A. Yes, sir. And there were bulbs . . .

Q. How many were there, more or less?

A. Eight or ten bulbs.

Q. Large or small?

A. Large, the same size as those of the fumigators.

Q. How were those bulbs switched on and off?

A. There was a general switch for all, but not all of them worked with the general switch because some were not connected to that switch. When the switch was turned on, those which were connected to that switch lighted, and if it was necessary to turn on others, we screwed in the bulb, and if it did not work then we turned on another switch and it lighted.

Q. Then, each one had an individual switch in addition to a general switch?

A. Yes, sir.

Q. And near the drum, was there a bulb?

A. Yes, sir.

Q. And how was that bulb installed?

A. It was hanging from the ceiling, from a wire.

Q. And how did it go on and off?

A. If it did not go on and off, with the general switch, otherwise with a small chain which it had."

The determination on the liability of West Indies—until we examine the evidence on specific acts of negligence which according to the findings of the trial judge account for the origin of the fire—does not depend on the greater or lesser accuracy with which the magistrate has made reference to some detail of the evidence in that respect, since that does not change the basic fact of the occurrence of the fire nor the origin thereof. It is not therefore necessary to consider this First Point of West Indies against the judgment rendered against it.

*Second Point*: West Indies points out in this Second Point of its brief, as being contrary to the evidence in the case, 18 counts of the findings of fact of the trial court:

(a) It maintains that there is no evidence on the existence of any electric switch "at the foot of the stairway." Indeed this assignment is without basis as well as significance. As we have seen from the deposition of Martín García, West Indies Manager, the general switch for the light was located "going down the stairway, to the right"; that "the switch was half way down the stairway"; that when its employee Carrasco walked down "four or five steps he put out his right hand"; that "the switch is behind the column"; that Carrasco turned on the switch and the explosion occurred "when he went around the stairway column," "about two seconds later." It also appears from the testimony of Domingo Osorio that the basement bulbs were turned on and off "by a switch which was on the stairway." "When we went down we turned on the switch and the bulb lighted."

The phrase "at the foot of the stairway" is reasonably supported by the evidence. West Indies tends to dramatize the alleged inaccuracy in order to lend color to the theory of its expert Colón that since bisulphide gas is 2.6 heavier than air, there could not be sufficient gas concentration around the switch (which West Indies places, by assignment (j) of this Second Point, as *fixed to the ceiling*, at about nine feet from the floor) to set off the explosion. The fact is, however, that the explosion occurred almost coetaneously with the turning on of that switch, regardless of the theory of the West Indies expert.

(b) As to the assertion of the trial judge that the manager of West Indies sent an employee "who never worked in fumigation," we have already said hereinabove that this was a lapsus of the magistrate which is irrelevant, since the instructions which manager Martín García gave to employee Carrasco to go to the basement and get a bulb were a reiteration of those which he gave first to another employee who went down and did not find the switch. Therefore, whether or not Carrasco worked in fumigation is not a

factor which bears on or alters the fact that he had to turn on the switch in order to get the bulb, since according to Martín García himself "he could not proceed down the stairway because of the darkness in that place."

(c) West Indies also challenges as being contrary to the evidence the finding that "indeed the evidence showed an absolute indifference and general lack of care on the part of West Indies to the manner of handling, storing and transporting an inflammable and explosive substance such as carbon bisulphide." The difficulty with this assignment lies in that West Indies predicates the same on the testimony of its witness Nazario, and the finding challenged is based, obviously, on the testimonies of Osorio, Hernández and other witnesses of plaintiff to which the trial judge gave credit. The manager himself, Martín García, testified that the night before the fire the bisulphide drum "was taken to the basement," notwithstanding his assertion in another part of his testimony that the carbon bisulphide was kept in the garage and that the night the fire occurred there was none in the factory because an empty drum had been removed the night before to the garage. Plaintiff's evidence, believed by the trial judge, supports his findings on the manner in which the carbon bisulphide used in the fumigation was handled.

(d, e, f) By these assignments West Indies challenges the findings of the trial judge that the evidence of West Indies on the origin of the fire pointed to its negligence and lack of care, since it showed that the explosion "was caused by the effect of an electric spark on the bisulphide gas which was at that time in the basement or in the fumigator in sufficient concentration," wherefore "either there was an abundant leakage of gas from the fumigator or there was sufficient gas concentration in the basement."

The foregoing finding is consistent with the analysis of García's deposition made by the trial judge on the basis of expert testimony in the sense that "only with sufficient bi-

sulphide gas concentration in that atmosphere would it be possible to set off the explosion by an electric spark or of fire in the basement."

In his deposition Martín García testified that "about two or three minutes after he [Carrasco] went down, the fluid gas came . . . that smoke and he dashed out through the door to give the warning. . . . Immediately it seemed as if the fluid had leaked in the fumigation chamber."

"Q. Did you smell that gas?
A. I heard a noise and I sensed something like smoke.
Q. But you said that the vapor from the tank leaked.
A. By the smell.
Q. Then you noticed the odor of the vapor from the carbon bisulphide?
A. That's what I imagine; I ran toward the front to call the firemen, and I went down and when I saw the flames I went to look for the old man Pedro."

West Indies' theory is that there occurred two explosions: one shortly after 6 p.m. and the other around 7 p.m. It maintains that the trial court erred by its failure to so determine.

This theory is absolutely without basis on the evidence. All the testimonies were to the effect that there occurred only one explosion. Its magnitude may be inferred from the fact that it destroyed the show windows of the building of the Aqueduct Service situated on the opposite side of Fernández Juncos Avenue.

(g) In this assignment West Indies alleges that the trial judge did not understand Martín García's testimony, in concluding that the explosion occurred when Carrasco turned on the switch. Again West Indies alleges that it was impossible for sufficient concentration of carbon bisulphide gas to be in the basement, according to its expert Colón. However, the fact of the explosion, coetaneous with the act of Carrasco of turning on the switch, remains unchanged.

(h) West Indies alleges that it did not permit a substantial leakage of bisulphide gas and that a gas leakage was not the cause of the disaster. Yet, it fails to support this contention.

(i, j, k, *l*) West Indies maintains that the first explosion occurred in the wall of the basement and a subsequent explosion in the small fumigator. We have already said that the evidence disclosed only one explosion, followed immediately by the fire. It also challenges the finding of the trial judge that the West Indies' theory was highly improbable in the sense that the explosion was due to the fact that the walls of the basement were so copiously permeated with the explosive gas that the heat from the braziers used in Evaristo Rivera's business was the cause of it.

Evaristo Rivera, owner of a small cafetín situated on the eastern side of the building, testified that there was a distance of 15 feet between the nearest wall of the building and the place where the braziers of his kiosk were burning. We agree with Goenaga that if the West Indies' theory that the infiltration of the carbon bisulphide gas was so copious in the walls of the basement that even the heat of a brazier in the open air, situated at a distance of 15 feet, could cause a disaster, were accepted, such theory would undoubtedly reveal the existence of a nuisance maintained by West Indies, in which case it would be liable for the damages caused, with or without negligence.

The finding that Evaristo Rivera "used almost daily" in his eating place charcoal braziers, if found to be erroneous, would favor West Indies; yet, it is not without basis in the evidence, since it is evident that when Rivera mentioned in his testimony the "Fridays and Saturdays," he was necessarily referring to the kind of food "which he served on Fridays there on the sidewalk," having already testified that both the employees of West Indies and Goenaga ate there,

and he went inside "to collect from those who had not paid me for the week."

The challenge of the finding that the liquid gas irons which Víctor Luciano Colón used in his business of vulcanization of automobile tires and tubes emitted "flames and sparks," is also insubstantial. If sparks were not emitted, witness Colón testified that when he set matches to the liquid gas irons, *the flame* was emitted through the top.

Assignment "m" of this Second Point challenging as being contrary to the evidence the finding that as a result of the incipient fire which occurred on February 26 "all of the employees of West Indies and of plaintiff's shop ran out of the building, alarmed by the 'incipient fire,' " is supported by the testimony of Esther Colón de Balseiro, who testified that she saw the smoke "which was asphyxiating us," that they screamed "Fire!," that all the other persons "went out on the street and could not remain because they were asphyxiating"; and by that of Adolfo García Rodríguez, who testified that when he arrived at the building he saw "great amount of smoke coming out of the main door" and that "there were many alarmed people outside"; that he tried to go in with the fireman, but could not because "the smoke was black, asphyxiating, unbearable," "that it was not common smoke," and that he then gave up and ordered the firemen to wear masks.

By assignment "n" West Indies challenges a finding which the judge has not made. It alleges that he concluded that immediately after the incipient fire occurred the insurance policy was cancelled. That contention is not correct. What the magistrate said was that the sum of $234.25 which West Indies claimed from Hanover Fire Insurance Company for the losses sustained as a result of the incipient fire "was paid to West Indies by the said insurance company, but almost immediately thereafter the policy of West Indies was can-

celled before its normal expiration." The testimony of Manuel San Juan, Jr., was exactly in the same sense.

The finding challenged by assignment "o" that "at the termination of the fumigation process, or before, if the tobacco was urgently needed for shipment, the fumigation chambers were opened and the tobacco removed in order to be packed and shipped," is supported by plaintiff's evidence, and what West Indies actually asks is that the testimonies of Osorio and Hernández be disregarded as false.

West Indies does not make assignment "q" on the basis that the finding therein challenged is contrary to the evidence, but rather because it considers it an "exaggeration." Conceding that not "all" of the employees of West Indies jumped out of the windows, actually there was evidence that some did.

By assignments "p" and "r" it is alleged that the trial judge erred in his statement of the properties and characteristics of carbon bisulphide.[4] Independently of whether the

---

[4] On the properties of carbon bisulphide and its use as a fumigant, the parties offered ample expert testimonies.

In the *National Fire Codes* published by the National Fire Protection Association, International, 1951, Vol. I, p. 517, the carbon bisulphide gas fumigation is described as follows:

"80. *Carbon Bisulphide Gas Fumigation*

This product is a satisfactory fumigant from the standpoint of killing of insects. Its vapor is heavier than air and permeates down through a mass of grain with relatively even distribution. *It is volatile and is confined to the place of fumigation with difficulty.* Extended exposure to the vapors of carbon bisulphide is dangerous to human beings. Exposure to light concentrations produces dizziness, without serious after-effects.

"Carbon bisulphide vapor *is extremely explosive. It has a low flashpoint* and is subject to detonation. Its danger may best be illustrated by the fact that an iron rod heated by boiling water and passed through the gas explodes it. An electric light bulb is sufficiently hot to explode the gas, or the heat created by the sun on a metal roof can do it. *The product is, therefore, considered too hazardous for general fumigation, and its use is not recommended.*

"To some extent it is used in isolated buildings built for the purpose, to fumigate second-hand bags or batches of stock that have become infested. When permitted, many plant operators use carbon

concept "volatile" should have been used in connection with the carbon bisulphide itself, which is a liquid, and not in connection with the gas produced by evaporation, as did the trial judge, the fact is that the parties' experts agreed that in order for a spark to set off the explosion upon turning on the switch, it was necessary that there be in the basement sufficient bisulphide gas concentration to ignite it.

In brief, the 18 assignments made by West Indies alleging error in the findings of the trial judge as being contrary to the evidence, are aimed at the weighing of the evidence made by the magistrate. From the examination which we have made of these assignments, we conclude that it is not necessary either to consider this Second Point against the judgment.

*Third Point: "The following findings of the court below are based on evidence so palpably false and so palpably absurd that no reasonable mind would give it any credence, and such findings are manifestly erroneous."*

bisulphide to fumigate grain in cars placed well away from all buildings. Cars so fumigated should be well ventilated before grain is unloaded into mills or elevators." (Italics ours.)

In the Table of Common Hazardous Chemicals, at p. 613 of the same work, the fire hazard of carbon bisulphide is described as follows:

"A highly volatile liquid with an offensive odor, giving off even at comparatively low temperatures *vapors* which form with air *flammable and explosive mixtures.* Flash point—30°C. (22°F.). (3) Flammable range 1% to 50% (4) (upward propagation). The ignition temperature is dangerously low, being about 100° to 106°C. (3) (212° to 223°F.). It is endothermic, and *the vapor may be ignited by a heavy blow.* The vapors are heavier than air (vapor density 2.62), and may travel a considerable distance to a source of ignition and flash back. *More hazardous than gasoline."* (Italics ours.)

As to the storage, the following is recommended:

"Isolate and safeguard containers against mechanical injury and metallic blows, and keep *in unheated compartment away from sunlight and any source of ignition, including electric lighting fixtures* and other electrical equipment.

"Storage tanks should be constructed over concrete basins containing water, and the carbon bisulphide kept blanketed with water or inert gas at all times." (Italics ours.)

(a) "West Indies used to purchase carbon bisulphide in liquid form in 550-pound drums and to store them in the garage, except that inside the basement it kept continuously one drum in use, namely, the drum from which it commonly took out bisulphide for immediate use in the fumigators."

(b) ". . . In the fumigation chambers there were also regular bulbs and on the outside of those chambers there was a switch which controlled the inside bulbs, which could also be switched on and off by hand."

(c) ". . . In contrast, some of the bulbs in the basement and in the fumigation chambers were switched on and off by West Indies employees by unscrewing the bulbs by hand from their sockets. Some times this sent off sparks or electric shock to those employees, especially when they were soaking wet with perspiration."

(d) ". . . owing to the great concentration of bisulphide gas currently in the fumigation chambers, the rest of the basement was flooded with gas when the chambers were opened, it being practically impossible to be there . . . . The bisulphide gas circulated all over and it could be smelled in the mornings even in the first floor."

(e) ". . . There was little ventilation, especially at night when the windows were closed."

West Indies tended to discredit the testimony of Osorio and Hernández, plaintiff's witnesses during the trial. It assumes the same position before this Court pointing out conflicting points in their respective testimonies which in its opinion are inherently incredible. In arguing assignment "a" of this Third Point challenging that part of the finding of the trial court that West Indies "inside the basement it kept continuously a drum in use, namely, the drum from which the bisulphide was currently taken out for immediate use in the fumigators," West Indies rationalizes by indicating that even if the carbon bisulphide were taken out of the drums in a bucket and the bucket were in turn taken to the door of the fumigator in order to empty it in the small pans which

were going to be placed inside the latter, why did West Indies have to keep the drum in the basement when the bisulphide could be taken out in the garage and carried in the bucket to the fumigator?

West Indies defeats its own argument with the testimony of the manager and treasurer, Arturo Martín García, who testified that the night before the fire the bisulphide drum which was being used "was brought to the basement," and from there he poured the bisulphide into the pans. Then, why bring it?

The challenge made by West Indies in assignments "b" and "c" alleging that the testimonies of Osorio and Hernández on the existence of a switch outside the fumigation chambers and that some of the bulbs in the basement were switched on and off by unscrewing them by hand from their sockets, sometimes producing sparks or electric shock, were false, is not supported by the evidence, and, furthermore, such facts are not pointed out by the trial judge as having caused the explosion and fire which destroyed the building.

As to assignments "d" and "e", the main difficulty with West Indies seems to be a question of degree: as to "d", the "great" concentration of gas; and as to "e", the "little" ventilation. In both cases the findings are supported by the evidence.

In none of the five assignments challenging the judgment can we agree with the West Indies' theory that the findings are based on evidence inherently incredible and false.

*Fourth Point:* "*The conclusions of law of the court below that the doctrine of res ipsa loquitur was applicable to this case, and that the disaster could have happened only as a proximate result of negligence of West Indies, are erroneous.*"

As to this point, West Indies merely (1) reiterates, by way of mere affirmation, the assignments made in the First,

Second and Third Points already considered, that the findings of the trial judge that West Indies was negligent are based on facts which were not admitted in evidence, are not supported by the evidence in the case, and are founded on testimony so false and absurd that no credit should be reasonably given to them; and (2) that since the uncontroverted evidence shows that the disaster could have occurred as a proximate result of the charcoal braziers which were placed against the fumigator, and probably it was the result thereof, such cause being an outside agent independent of the West Indies factory and its operation, the res ipsa loquitur doctrine is not applicable to the case.

■ The trial judge determined correctly that, as to the liability of West Indies, the res ipsa loquitur doctrine was applicable.

The concurrence of the three requirements generally considered necessary for the application of that doctrine are present in the case, disregarding, for the purposes of the examination of the question raised, the testimony of Arturo Martín García, West Indies manager.

". . . (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff." *Hermida* v. *Feliciano*, 62 P.R.R. 54, 56 (1943).

■ The West Indies' theory that the infiltration of bisulphide gas in the walls of the fumigator was such that the explosion occurred as a result of the heat from the braziers of the kiosk or cafetín of Evaristo Rivera, is not only highly improbable, as determined by the trial judge, but the facts belie any basis for such theory because of the distance at which the braziers were placed from the walls of the basement. Dispensing with the testimony of Martín García, the

res ipsa loquitur doctrine, as accepted in our case law[5] and stated in other jurisdictions,[6] is applicable in this case.

Notwithstanding this, the testimony of Martín García having been admitted, we need not rely on the inference of negligence supplied by res ipsa loquitur, since that testimony actually established that the explosion occurred when another

[5] *Matta* v. *Pueblo Super Market,* 80 P.R.R. 498 (1958); *Martínez* v. *U.S. Casualty Co.,* 79 P.R.R. 561 (1956); *Rodríguez* v. *Aponte,* 78 P.R.R. 719 (1955); *Cintrón* v. *A. Roig, Sucrs.,* 74 P.R.R. 957 (1953); *Román* v. *Mueblería Central,* 72 P.R.R. 320 (1951); *Padilla* v. *García,* 62 P.R.R. 771 (1943); *Rodríguez* v. *White Star Bus Line,* 54 P.R.R. 294 (1939); *cf. Kirchberger* v. *Gover,* 76 P.R.R. 851 (1954); *Hermida* v. *Feliciano, supra.*

[6] *Sweeney* v. *Erving,* 228 U.S. 233, 57 L.Ed. 815; *Commercial Molasses Corp.* v. *New York Tank Barge Corp.,* 314 U.S. 104, 86 L.Ed. 89; *Bohlen* v. *Glenn L. Martin Co.,* 67 A.2d 251; *Frenkil* v. *Johnson,* 3 A.2d 479, 481; *Sistrunk* v. *Texas Holding Co.,* 264 Pac. 259, 262; *Standard Oil Co.* v. *Midgett,* 166 F.2d 562 (4th Cir. 1941); *Implement Dealers Mut. Fire Ins. Co.* v. *Golden et al.,* 44 N.W.2d 264; *Koehler* v. *Thiensville State Bank et al.,* 14 N.W.2d 15; *Phillips Petroleoum Co.* v. *Berry,* 65 S.W.2d 533; *Guilford* v. *Foster & Davis,* 268 Pac. 299; *Hagan & Cushing Co.* v. *Washington Water Power Co.,* 99 F.2d 614; *Warner* v. *Pittsburgh–Idaho Co.,* 220 Pac. 492; *Levin* v. *New York Central & H.R.R. Co.,* 133 N.Y.Supp. 467; *Stone* v. *Texas Company,* 105 S.E. 425; *Newton* v. *Texas Co.,* 105 S.E. 435; *Howard* v. *Texas Co.,* 169 S.E. 832; *Pulvin* v. *Hudson Auto Lamp,* 172 N.Y.Supp. 340; *Chiles* v. *Ft. Smith Commission Co.,* 215 S.W. 11; *Rathbourn* v. *White,* 107 Pac. 309; *Tyreco Refining Co.* v. *Cook,* 110 S.W.2d 219; *Gulf Refining Co.* v. *Delavan,* 203 F.2d 769.

See Annotations in: 22 A.L.R.2d 791; 56 A.L.R. 593; 39 A.L.R. 1006; 8 A.L.R. 500, 1250; and Seavey, *Res Ipsa Loquitur: Tabula in Naufragio,* 63 Harv. L. Rev. 643; Prosser, *The Procedural Effect of Res Ipsa Loquitur,* 20 Minn. L. Rev. 241; Heckel and Harker, *Effect of the Doctrine of Res Ipsa Loquitur,* 22 Ill. L. Rev. 724.

In Spanish Law, see II-2 Puig Brutau, *Fundamentos de Derecho Civil* 681–82: ". . . The normal criterion is to consider that the plaintiff has the burden of proof of defendant's fault. However, this evidence may seem somewhat difficult, wherefore there is in this point a double deformative tendency of the general rule that the burden of proof rests upon the plaintiff. The damage may have been produced in certain instances in such a way or under such circumstances that it would be reasonable to presume defendant's fault (res ipsa loquitur). In other instances the displacement of the burden of proof may be due, not to the circumstance that there is a presumption of defendant's fault, but to the desirability of producing an effect comparable to that derived from faultless liability but founded on a hazardous activity." *Cf. Morales* v. *Met. Pack. & Ware. Co.,* 86 P.R.R. 3 (1962).

West Indies employee turned on an electric switch in the basement. The West Indies evidence showed that the explosion occurred in the small fumigator and that the latter had no wall in contact with Evaristo Rivera's business. Both under the res ipsa loquitur doctrine, and in view of the specific acts of negligence and lack of care which the trial judge found proved, his determination on the West Indies liability was correct.

## Appeal of Goenaga

The trial judge released codefendant Francisco from liability on the ground that the latter, as owner of the building, had no control, custody, or ownership over the business of West Indies nor over the premises occupied by it, especially the place where West Indies fumigated the tobacco with carbon bisulphide, wherefore any negligence of West Indies was not in law imputable to Francisco. Notwithstanding the foregoing, he also made the following findings:

"However, codefendant Francisco would have been negligent if the fumigation of tobacco with carbon bisulphide on the part of West Indies would have been continuous and inherently hazardous. In such case it would have been the lessor's duty to prohibit the continuation of that activity. The failure to comply with that duty would have implied negligence on the part of Miguel Francisco. However, we have already held that the fumigation of tobacco with carbon bisulphide is not in itself inherently hazardous, but may be carried out without any hazard by adopting proper precautions. Therefore, it was not Miguel Francisco's duty to discontinue that activity or to make demand to West Indies to discontinue the fumigation of tobacco with carbon bisulphide. In the absence of such obligation, we cannot conclude that Miguel Francisco was negligent. Although the lease between West Indies and Miguel Francisco was on a month-to-month basis, codefendant Francisco was not obligated either to discontinue the lease merely because West Indies fumigated tobacco with carbon bisulphide, since such activity did not involve inherent hazard or dangers. The lessor was acting reasonably in

the belief that West Indies would not be negligent in the fumigation of tobacco with carbon bisulphide. He had the right to assume that the lessee would continue acting reasonably and taking all the proper precautions of the case. In the normal course of business it is necessary to rely on the good faith and on the reasonable presumption that one will act with care and not negligently.

"There could be negligence on the part of a lessor upon learning of the existence of inherently inflammable or explosive substances in his real property, since the fact of the existence of such substances implies a continuous condition of hazard; however, a lessor is not responsible for permitting an economic activity which is and has always been usual in the community and which is not hazardous in itself."

In her appeal, Goenaga, admitting the facts established by the trial court, maintains as a question of law that it was error to release Francisco from liability for the damages sustained as a result of the fire.

As to the facts established respecting the conditions of the building owned by Francisco, as to his knowledge at the time of leasing part thereof to West Indies to be devoted to a business for the manufacture of tobacco, as to the form and manner in which West Indies stored and handled the carbon bisulphide and carried out the process of fumigation, as to the incipient fire, as to the notice and warning which Goenaga gave to Francisco that same day as a result of the incipient fire (see footnote 3) to give immediate attention to the matter in order to prevent a disaster because the building did not meet "the requirements necessary to house therein a business such as that of West Indies" and which at the same time would protect her against fire, as to the answer of Francisco[7] advising her that if she was afraid of "the negli-

---

[7] "My dear Mrs. Goenaga:

.     .          .               .          .          .

Referring now to your letter of February 26 regarding the

gence of the neighbor below" she should situate herself "at a convenient distance from the place of hazard," the following facts appear from the documentary evidence sent up to this Court:[8]

Francisco had insured the building for $25,000 under a policy with Unity Fire Insurance Corporation for a period of one year counted as of August 7, 1945. On January 25, 1946 a rider was attached to that policy authorizing the insured to fumigate periodically the premises covered thereunder. On January 22, 1946 Francisco took out another policy

incipient fire which occurred underneath your shop, I must tell you that I was very much surprised by that letter.

How can you, my distinguished lady, believe for a second that I have control over the businesses of the neighbor below? You are a very intelligent person and must be aware that accidents occur even where great care is exercised.

The West Indies Trading Co., lessee of the lower floor of the building which you occupy, is a responsible enterprise and I have no reason to suspect that it is negligent. Nonetheless, there are two ways of protecting yourself against its negligence, to wit: insuring your property in a sufficient amount to protect yourself against any loss, or to let another one run the risk after you vacate the premises.

Honestly, Doña Conchita, in my long years of experience this is the first time I hear it said that the owner of certain property is liable for the voluntary or involuntary acts of one of his tenants.

Pardon me for the advice that if you fear the negligence of the neighbor below, you should situate yourself at a convenient distance from the place of hazard.

I assure you, my distinguished Doña Conchita, that I am always willing to please you in everything which may be reasonable.

Very truly yours,
(s) Miguel Francisco."

[8] There was also evidence at the trial that when Francisco made the lease with West Indies, Goenaga warned him of the hazard of the business which West Indies proposed to establish, in which it would use carbon bisulphide for fumigating tobacco. Evidence was also heard at the trial that Francisco paid regular visits to the building and that on more than one occasion he went to the basement of the building occupied by West Indies. Although these facts do not form part of the trial court's findings, the magistrate did not find either that Francisco was not unaware that West Indies fumigated tobacco in its business with carbon bisulphide, although he did make findings that Francisco had no knowledge that it did it negligently.

with Rhode Island Insurance Company for the sum of $10,000 on his building, the basement of which was devoted, as set out in that document, "to a warehouse for cigars and fumigation; the second floor to a cigar factory, and the rest to a sewing business." It was set forth in the policy that in consideration "of the additional payment of a premium of 5 per cent, the insured is authorized to fumigate periodically the premises described under these policies."

■ On the other hand, there is some inconsistency in the findings of the trial court between those which determine the properties or characteristics of carbon bisulphide and the bisulphide gas, on the one hand, as "highly inflammable and explosive substances" the "vapors or gases of which may be exploded by sparks, friction, flames or fire flashes," and "may produce an explosion merely by the flash of a common electric bulb," and that since such gas is "highly volatile" it is "practically impossible to prevent it from leaking from within a completely closed space," wherefore "it is considered that the fumigation operations with bisulphide gas constitutes a latent hazard unless due precautions and care are taken"; and on the other hand, the finding that "the fumigation of tobacco with carbon bisulphide is not in itself inherently hazardous." The latter finding does not seem to correspond to the properties of carbon bisulphide gas. We have already seen that in the *National Fire Codes*—footnote 4—it is stated that such gas "is considered too hazardous for general fumigation, and its use is not recommended." Francisco's expert himself admitted that "the hazard [of fire or explosion] always exists when any combustible is used." Precisely because carbon bisulphide is a highly volatile liquid, the vapors of which are heavier than the air with which they form *inflammable* and *explosive* substances—with a "dangerously low" ignition temperature—that the potential risk of fire or explosion is always present. The gases produced by evaporation and not the carbon bisulphide liquid

itself is what produced the fumigation action. That is why the fumigation activity is of a hazardous character, since the risk follows the very nature of the fumigation agent; nonetheless, in adequate installations in which the agent is handled with utmost care and with the precautions recommended, such process may be developed with relative security.

In the light of all the facts and circumstances present in this case, it may be readily observed that when Francisco leased the basement and a part of the first floor of his building to West Indies to be devoted to the business of tobacco manufacturing, he imposed on Goenaga, as colessee of West Indies, a situation of continuous hazard owing to the potential risk involved in the use by West Indies in the business to which it was going to devote the leased premises of a "very hazardous agent for the fumigation," such as carbon bisulphide gas.[9] On the "notorious hazard of danger" implied by the fact of storing "inflammable and explosive substances" such as nitrocellulose, see the judgment of October 14, 1957, 62 Jur. Civ. 1044, 1048;[10] and as to the "notorious hazard" of petroleum, the judgments of December 5, 1958 and January 18, 1960.

■ Among the legal obligations which the lease relationship produced in the lessor is the obligation to maintain the lessee in the peaceful enjoyment of the lease during all the time of the contract. Section 1444, subd. 3, of the Civil Code, counterpart of § 1554 of the Spanish Code. By virtue of this obligation which the doctrine calls *warranty*, "the lessor shall

---

[9] The Ordinance of February 20, 1920, "Establishing Rules for the Storage of Combustible Liquids within the Municipality of San Juan," required the obtainment of a permit which, it is conceded, West Indies did not have. "Combustible Liquids" is defined in that ordinance as "any liquid or viscous product *which emits inflammable vapors* at a temperature of less than 100° F. . . . but which burns upon being ignited." Carbon bisulphide certainly comes within that definition.

[10] The expert for codefendant Francisco testified that "Neither carbon bisulphide nor nitrocellulose would come under hazardous explosives."

be responsible for his own or someone else's acts which disturb the lessee in the peaceful enjoyment of the thing leased, and for the defects therein which may impede or make difficult such enjoyment." 4 Castán, *Derecho Civil Español* 259 (8th ed.) The lessor—in order to warrant against disturbance by his *own* act—"should abstain from performing all those acts which may impede or disturb the use of the thing by the lessee," wherefore, according to Castán, in addition to the fact that he cannot change the form of the thing leased, pursuant to § 1557 of the Spanish Civil Code (counterpart of our § 1447), "it must be understood that he cannot exercise either his right, as owner, over the part of the thing not leased in such a way as to cause annoyance to his lessee, for example, by leasing another floor of the same house for an illicit establishment such as a place of gambling or of prostitution."

■ In the same connection, Clemente de Diego says: "It is evident that he would not know his obligation to allow the lessee to have the peaceful enjoyment if, after entering into the lease, he should lease to another the same house or another floor of the same house *for a hazardous industry* or for an illicit establishment (house of gambling, of prostitution, etc.)." 2 De Diego, *Instituciones de Derecho Civil* 265. (Italics ours.) To the same effect, see 3 Borrell y Soler, *Derecho Civil Español* 435, and 25 Laurent, *Derecho Civil Francés* 153–54.

Manresa holds the same view, and comments: "By the same token, if the owner of the house rents the floor above mine to establish therein an industry of the kind which upon being operated produces constant noises and trepidations which annoy and disturb the tranquillity of the family life, there is no question that he is committing a violation of the obligation imposed on him by subd. 3 of § 1.554."

■ The doctrine of voluntary assumption of the risk does not come into play in this case. By virtue of her lease contract with Francisco, Goenaga was colessee of West Indies and was occupying the place where she had the right to be under the lease. *Palmer* v. *Barreras*, 73 P.R.R. 266 (1952) ; Prosser, *Torts* 376 *et seq.*

Nor are we making here any determination on the liabilities which may accrue under § 1451[11] of the Civil Code (§ 1561 of the Spanish Civil Code) from the lease relationship existing between West Indies and Francisco.

What we examine in this case is the liability of West Indies and Francisco to Goenaga for the violation of a legal duty on the part of West Indies, as colessee,[12] and the violation of a legal duty on the part of Francisco, as lessor, both violations being the source of the state of hazard which both imposed on Goenaga, and, definitively, the joint cause of the damage caused to her as a result of the fire,[13] which

---

[11] See *Cabinero* v. *Cobián; Hanover Fire Ins. Co., Int.,* 81 P.R.R. 926 (1960).

[12] "In the use of a thing the lessee shall refrain from performing any acts which, even if they do not injure the lessor directly, may cause annoyances to other persons, as, for example, *the other lessees of the same property*. The noises which disturb the tranquillity of the neighbors of urban properties, the production of fetid or nauseating odors, etc., even assuming that they do not cause damage to the thing nor substantial injury to the owner, are forbidden to the lessee, *and the lessor should have action to prevent them*; and also the persons especially affected by the annoyance may also proceed against the person causing it." 10 Manresa, *Código Civil* 556 (5th ed.).

[13] "Not only is the material wrongdoer responsible for the damage but also the indirect wrongdoer . . . *the cause of the cause is the cause of the effect.*" Borrell Maciá, *Responsabilidades* 66. See Levitt, *A Passive Situation as a Proximate Cause,* 92 Cent. L.J. 390, 53 A.L.R. 327, 4 A.L.R. 740.

The Spanish doctrine favors the theory that in the two assumptions of subd. 1 of § 1908 of the Spanish Civil Code (our § 1808), as respects the liability for "the explosion of machines which may not have been cared for with due diligence" and "for kindling of explosive substances which may not have been placed in a safe and proper place," the notion of

liability Fràncisco cannot elude under the theory of lack of control as a result of having transferred possession to West Indies.

Francisco failed to comply with his legal obligation to maintain Goenaga in the peaceful enjoyment of the thing during the entire lease term by permitting, first, the creation of a situation of hazard arising from the fumigation activity of West Indies, and then, through his negligence, by his inaction, in suffering such situation to continue; and West Indies failed to comply with its obligation to Goenaga, first, in establishing the plant for the process of fumigation, with its potential hazard of fire or explosion by the use therein of carbon bisulphide gas, and then, through his negligence in not adopting the measures of care and precaution and technical guarantees recommended for the development of such a hazardous activity. Both are collaborators in the situation of hazard to which Goenaga was exposed, and in the cause of the disaster; and under those circumstances neither the theory of the need of control or possession of the thing, nor that of proximate cause, comes into play here as respects Francisco in order to hold him liable to Goenaga, jointly with West Indies, for the damages suffered by her as a result of the fire which destroyed her business.[14]

---

presumption of fault prevails, 2 Puig Brutau, *Fundamentos de Derecho Civil* 697–700; Borrell Maciá, *Responsabilidades* 229; 2-2 Puig Peña, *Tratado de Derecho Civil* 583; 2 Díaz Pairó, *Introducción al Derecho de Obligaciones* 65–66; 7 Oyuelos, *Digesto* 767.

[14] Manresa, like Bonel y Sánchez, is of the opinion that the *owner of the building* is liable for the damages caused by causes independent of its destruction in the cases referred to in § 1908 of the Spanish Civil Code (our § 1808). 12 Manresa, *Código Civil* 694–97 (5th ed.), and 4 Bonel y Sánchez, *Código Civil Español* 900–01. See, also, Luis Muñoz, *Comentarios a los Códigos Civiles de España e Hispanoamérica* 976–77, setting forth doctrinal criteria contrary to the notion of fault, pointing out the opinion of Josserand that "the reason for the liability for the doing of the things lies in that he who has the use of a thing should bear the risk and the damage caused by the thing." In that connection, see McNiece and Thorton, *Affirmative Duties in Tort*, 58 Yale L.J. 1272. Of our case law,

Under the circumstances pointed out, the trial judge erred in exonerating codefendant Francisco from liability.

■ Let us turn to consider, copying first at length the findings of the trial judge to that effect, the judgment for damages against West Indies.

---

*cf. Cole* v. *Escambrón Development Co.,* 73 P.R.R. 477 (1952); *Prado* v. *Quiñones,* 78 P.R.R. 300 (1955); and *Serrano* v. *López,* 79 P.R.R. 922 (1957).

Borrell Maciá presents as follows the problem in connection with the liability of the owner of the building in the instances provided in § 1908 *supra* (explosion of machines which may not have been cared for with due diligence, and the kindling of explosive substances which may not have been placed in a safe and proper place, among others):

"However, assuming that the owner is not the wrongdoer, for the reasons stated, but rather a tenant, who is bound to indemnify?

"Anyone who causes damage through fault or negligence is bound to indemnify, according to § 1,902; but, in addition to his liability, can the owner also be held liable?

"If the owner of the building is also the owner of the machines not cared for with due diligence, there is no question that he is; if the excessive and injurious smoke is the consequence of the industry, there is no question that it will also affect the fault; and in the case of the construction of sewers or deposits of infectious matters, constructed without the precautions required in the particular place, evidently the owner of the building who constructed them shall be directly liable.

"However, if the machines belong to the tenant and, consequently, he himself should look after their conservation and perfect operation, will the owner of the real property be liable also?

"In the affirmative, it may be alleged that the tenant possesses the property in the name of the owner and under a contract stipulating the lease conditions and the rights of the lessee to use the leased property; and, consequently, the owner has power to prohibit the installation of the machines or else make sure that they will not constitute a hazard for third persons; and that in providing that 'the owners shall be equally liable,' it seems that it refers to the owners of buildings mentioned in the preceding section.

"In the negative, it may be alleged that if the owner rents certain premises to a person, it is understood that the tenant must comply with the laws and ordinances relative to the use and installation of machinery, whether or not it is specifically stipulated in the contract; and, except in the case of force majeure, if he complies with the requirements, the explosion would not occur; and that since the section refers to owners, it should be understood to mean the owners of the machines; moreover, bearing in mind that they may explode in closed premises, or in the middle of the street, and that it is more reasonable that this section should cover all cases.

"I am inclined to believe that, applying the general principle that

## The Findings of Fact

### (Damages)

"The accounting books of plaintiff's business or factory were lost or destroyed in the fire which followed the explosion which occurred in Edificio Rosales on June 8, 1946. When the explosion occurred the safe in which these books were kept fell from the second floor to the basement, crashing in its descent against one or more of the concrete beams of the building, then burst open and fell to the floor of the basement after it was open, it having been unable to find those books notwithstanding plaintiff's efforts and diligence.

"In that disaster plaintiff lost her machinery, equipment and furniture, the processed merchandise which she had in the shop pending final preparation for shipment, the unprocessed merchandise, the basic patterns and exclusive designs, and the sum of $728 in petty cash of her business the day of the disaster. As a result of the destruction of the unprocessed merchandise, plaintiff failed to receive profits from the sales already transacted, which she would indeed have received if that merchandise had not been lost, for she had already put in order the production which would be made with the unprocessed merchandise.

"Plaintiff was not what is commonly known as a shopkeeper; that is, she was not a contractor of those who furnish work or labor for making dresses, the raw material for which was sent to her by other persons or entities in or outside of Puerto Rico. Plaintiff was a clothing manufacturer. She purchased independently the fabrics, buttons, ribbons, etc., processed the finished products such as children's dresses, baptismal dresses, etc., and then shipped and sold them in the United States. For such manufacturing enterprise plaintiff had employees working in her shop, and she also had subcontractors in several parts of the Island. These subcontractors picked up the raw material in plaintiff's shop, sewed and processed the dresses following the instructions

---

liability cannot be exacted if there is no fault or negligence, unless the authorization to install the machines on the leased premises is considered as such, the owner is not responsible for the explosion of the machines which are not his.

"The same may be said of the kindling of explosive substances which are not placed in a safe and proper place."

and styles given by plaintiff, and afterwards delivered the finished products at her shop where they were paid for their work. After the subcontractors received the material necessary for making the dresses, they signed a document called 'remittance sheet' setting forth the name and address of the subcontractor, the quantity and class of material received by them, the date, the working instructions, the number or numbers of the styles to be processed or manufactured, and various other details. Plaintiff kept one copy of this document. The original was for the subcontractor. When the subcontractor brought and delivered the finished products at the shop, he also signed another document called 'return sheet' containing information and details similar to those of the 'remittance sheets,' including the number or numbers of the styles of dresses processed by the subcontractor.

"As to the work performed in the shop, the same was set forth in other documents called 'cut sheets' in which the quantity of fabrics cut, the date of the cutting, the style or the styles of dresses to be manufactured with such fabrics, and other pertinent data were set forth. Furthermore, according to the requirements of the Federal Wage and Hour Act, the workers or employees of the shop were required to fill out and keep notebooks showing the work performed by them and the hours devoted to such tasks.

"Plaintiff sold her products in the United States market. She had a sales representative named Helen Dudley Mohr in the city of New York, and she also transacted sales in the United States through a distributing agent named Associated Merchandising Corporation, the seat of which was in the city of New York.

"The sales invoices of plaintiff's business were consecutively enumerated, dated, and they showed by styles the sales transacted.

"The selling process of every style manufactured and sold by plaintiff were audited, controlled and fixed by the Federal Office of Price Administration, which agency analyzed the production costs and fixed the selling prices per dozen of each style of dresses manufactured.

"The machinery, fixtures and furniture which plaintiff had in her shop in Edificio Rosales and which were destroyed by the explosion and fire which occurred on June 8, 1946, consisted

of the effects or items set out in plaintiff's Exhibit 15 and its two appendices.

"The processed merchandise lost by plaintiff by destruction in that explosion and fire is that which is set out in detail in plaintiff's Exhibit 16, substantiated and satisfactorily proved by plaintiff's testimony, by appendices 1, 2, 3, 4 and 5 of that exhibit, by the stipulation of the parties, and by the report of accountant E. J. Lugo (West Indies Exhibit O, in rebuttal). Those exhibits and appendices show the material which plaintiff sent to the subcontractors from January 1, 1945, to the date of the explosion and fire, as well as the processed dresses or merchandise delivered by the subcontractors at the shop during that period. They also show the merchandise processed in the shop during the same period, the sales of processed merchandise transacted during that period and their value in money, namely, the selling price of such merchandise authorized by the O.P.A. which agrees with that shown on plaintiff's sales invoices. Thus, those exhibits and appendices, in which everything is shown by styles, shows a reasonably accurate result indicative of the stock actually existing in plaintiff's shop, in processed merchandise, on the day of the disaster.

"The unprocessed merchandise which plaintiff lost by destruction in that disaster is that listed in Exhibit 17, substantiated and satisfactorily proved by the appendices, by the stipulation of the parties, by plaintiff's testimony, and by the report of accountant Lugo. This evidence shows the purchases and receipt of materials of plaintiff from January 1945 to June 8, 1946, as well as the material used in the manufacture of dresses and products during the same period. By deducting the latter from the former, the existence or inventory of unprocessed merchandise or materials in plaintiff's shop on the day of the fire was established. The value of this merchandise or materials is shown in the purchase invoices submitted.

"The profits which plaintiff failed to realize by her inability to carry out the sales already contracted on June 8, 1946, are shown in her Exhibit 18, substantiated and satisfactorily established by the appendices, by plaintiff's testimony and by the stipulation of the parties. This evidence establishes the fabrics and other materials purchased, received and which had not been used at the time of the fire, the styles or models of dresses to be manufactured with those fabrics and materials, the quan-

tity of fabrics and materials to be used in each dozen dresses or styles, the number of dozen dresses of each style which would have been manufactured, and the selling price per dozen fixed by the O.P.A. for each style, from which price the production and sales cost is deducted, also authorized by the O.P.A., the net profit per dozen being thus determined. The evidence also shows plaintiff's orders pending shipment, which orders showed the number of dozen dresses already contracted for and the style of every dress ordered, which agrees with the styles to be manufactured with the fabrics and materials purchased and received.

"Seventeen basic patterns and exclusive designs were destroyed by the fire. These patterns and designs have an actual cash value and their destruction meant to plaintiff the loss of the time originally spent by her in creating them. However, since she used from 1943 to 1946 patterns 400, 1400, 700, 1700, 900, and 1900; from 1944 to 1946 patterns 8900, 200, 1200, 500, 100, and 3700; and from 1945 to 1946 patterns 8200, 8800, 1600, and 300, actually plaintiff lost only the time spent on each pattern less the reasonable value of the use of each pattern, wherefore the compensation claimed on this account should be reduced."

At the close of her evidence on liability and for the purposes of the presentation of her evidence on damages, plaintiff suggested the appointment of a Master under Rule 53 of the former Rules of Civil Procedure, to which West Indies objected, and thereupon Goenaga announced that she would appear at the next session "to prove item by item." The court urged the parties to reach some agreement and at the next session, agreed upon by the parties, there was approved the following

"STIPULATION

"In order to speed up the trial and simplify the proceeding, the parties stipulate the following as to the procedure for presenting the evidence on the damages claimed by plaintiff in this case:

"1. The party plaintiff may commence with the oral testimony of plaintiff and of any other witness or witnesses in respect to the amount of the damages. Insofar as such testimony or testimonies are based on disclosures of documents in posses-

sion of plaintiff, it shall not be necessary to offer such documents in evidence, it being sufficient that such documents be identified and deposited with the court, classifying them on the basis of the six items comprised in the claim for damages. Nor shall it be necessary to establish, on direct examination of those witnesses, all the items which compose each one of the six principal items of damages claimed, defendants accepting that the witnesses limit their testimony, on direct examination, to the aggregate amount of those six principal items, it being agreed between the parties that the items of damages thus substantiated shall be deemed established; however, if any of them be challenged by defendants, the court shall in such event pass upon their propriety on the basis of the direct evidence, the evidence of challenge and the evidence in rebuttal which plaintiff may present.

"2. At the close of plaintiff's direct evidence on the damages, as already stated, and the cross-examination of plaintiff's witnesses, there shall be heard defendants' evidence on the liability of defendants, at the close of which plaintiff may present evidence in rebuttal on the same point and the defendants in surrebuttal. At the close of the evidence on the liability of defendants, if the latter are not yet prepared to present their evidence on the amount of the damages because they have not finished checking the documents on the damages which may have been identified by plaintiff, the trial will be postponed for a reasonable length of time in order to finish the checking.

"3. The documentary evidence which plaintiff may identify and deposit with the clerk, and that which defendant West Indies Trading Corporation has already deposited or identified, shall be placed at the disposal of the attorneys for the parties and of the accountants whom the parties may designate to make the examination and study. The clerk shall adopt proper measures in order that such documents may not be misplaced.

"4. As soon as the study and checking of the documents deposited with the clerk or with the court is terminated, or as soon as a reasonable period for such purposes expires, the parties, or any of them, shall move that a day be set to resume the trial at which defendants' evidence on the damages shall be heard, at the close of which plaintiff may present evidence in rebuttal and defendants on surrebuttal."

The preceding stipulation, which was approved by the magistrate who tried the case on the merits, governed the procedures for the presentation of the evidence on the damages claimed by Goenaga.

West Indies devotes the Fifth Point of its lengthy brief to maintaining that the trial judge erred in admitting the evidence on damages presented by Goenaga and which is contained in the reports or statements First, Second, Third, Fourth and Fifth and the supporting documents (plaintiff's Exhibits XV, XVI, XVII and XVIII), by refusing to strike out that evidence from the record and in basing its findings on the amount of the damages on that evidence.

It must be recalled that when West Indies objected to the appointment of a Master, Goenaga announced at the close of the evidence on liability that she would proceed to prove the damages claimed, item by item. The stipulation submitted by the parties dispensed with the formal presentation in evidence of Goenaga's documentary evidence consisting of vouchers, invoices, bills of lading, etc., on the basis of which the statements or reports presented and submitted by plaintiff were prepared, classifying the same by the type of loss sustained, and to which she referred verbally in her testimony at the trial court. In that testimony Goenaga explained the procedure followed in the verification of the losses sustained by her as a result of the fire. She substantiated, in essence, the reports prepared for that purpose. Defendants, on their part, did not actually challenge specifically the items of damages thus proved by Goenaga, following the form and manner agreed upon for the presentation of their evidence.

By the stipulation in question the parties agreed that it would not be necessary to establish by Goenaga's oral evidence all the items which composed each one "of the six principal items of damages" claimed, defendants having agreed that such oral evidence be confined in the direct exam-

ination "to the aggregate amount of those six principal items, *it being agreed between the parties that the items of damages thus substantiated shall be deemed established,*" but that "if any of them be challenged by defendants, the court shall in such event pass upon their propriety on the basis of the direct evidence, the evidence of challenge, and the evidence in rebuttal which plaintiff may present." West Indies offered in evidence, also on the basis of the stipulation, a report prepared by public accountant Eurípides J. Lugo based on his examination of Goenaga's reports and on the supporting documents. That report, to which Goenaga replied—since the accountant himself was examined at length on the witness stand—did not controvert plaintiff's evidence on the damages.

Goenaga's report I (Exhibit XV) contains a listing of the fixtures, machinery and furniture of the shop, together with their original costs and replacement values at the time of the fire, which report was supported by two appendices setting out those items—appendix 1 comprising the invoices showing the original value of the fixtures, and appendix 2 showing the replacement cost.

Goenaga's report II (Exhibit XVI) is a statement of the processed merchandise lost in the fire and its value taking as basis the date of January 1, 1945, up to the date of the fire. This statement was duly established by the originals of the remittance sheets of each subcontractor to whom Goenaga used to send fabrics and other material to be processed. Goenaga obtained these remittance sheets from the subcontractors themselves. She also obtained from them return sheets, namely, the records of the processed merchandise which the subcontractors had returned to Goenaga corresponding to the materials which had been previously remitted to them. On the basis of these sheets she determined accurately, *by styles*, the quantity of processed merchandise returned by the subcontractors to the shop during the aforesaid period. After verifying the merchandise processed dur-

ing that period, the sales transacted during the same period were also verified, also *by styles*, and the result showed the processed merchandise in the shop at the time of the fire. The merchandise corresponds to 56 styles of the 100 or more styles of dresses manufactured and sold by Goenaga.[15]

Reports III and IV comprise the statement of the unprocessed merchandise existing in the shop at the time of the fire, and its value, the same having been verified by the documents and records referred to in appendices 1, 2 and 3(a) of report III and appendices 1 and 2 of report IV.

Report V (Exhibit XVIII) establishes in detail the profits which were not received, and is based on the records and documents identified and submitted to the trial court which were examined and studied by accountant Lugo, of West Indies, who submitted the report referred to above.

In view of the terms of the stipulation made by the parties and the detailed examination of the reports, their appendices, and supporting documents, we cannot agree that Goenaga's claim is without basis. The parties bound themselves by the stipulation, and Goenaga had the right to rely on the terms thereof and that it would have the legal effect which its own terms implied. The parties having agreed that the items of damages claimed by Goenaga, after they were substantiated in the manner stipulated, *would be considered proved*, it is correct that codefendants practically delegated, unsuccessfully, to accountant Lugo the legal function of challenging those items.

---

[15] The outline of the procedure followed by Goenaga in establishing her claim for loss of processed merchandise is pointed out only as an example of the accuracy with which plaintiff carried out her arduous process of verifying the different items of damages sustained in her business as a result of the fire. Each one of the five reports on damages, which are substantiated by several appendices and corresponding documents, as well as by her own testimony, established Goenaga's claim which the trial judge deemed correct.

■ The basis of Goenaga's evidence on the damages is reasonable and is not the product "of mere speculation or guess." *White Star Bus Line, Inc.* v. *Glens Falls Indemnity Co.*, 60 P.R.R. 830 (1942). Any doubt which could be attributed to Goenaga's evidence as to the manner of computing the damages would be "an uncertainty caused by the defendant's own wrongful act, and justice and sound public policy alike require that he should bear the risk of the uncertainty thus produced." *White Star Bus Line, Inc.* v. *Glens Falls Indemnity Co.*, *supra*. See, also, *Package Closure Corp.* v. *Sealright Co.*, 141 F.2d 972; *Palmer* v. *Connecticut Railway & Light Co.*, 311 U.S. 544, 85 L.Ed. 336; *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U.S. 555, 75 L.Ed. 544; *Bigelow* v. *R.K.O. Radio Pictures, Inc.*, 327 U.S. 251, 90 L.Ed. 652.

■ With the exception of the trial judge's inadvertence in awarding $1,384 in excess ($42,962) in the item of loss in the processed merchandise, since plaintiff in her testimony said that it was the sum of $41,578, and of the error—admitted in Goenaga's Report in Rebuttal—in having claimed $69.75 in excess in the item of fixtures, furniture and machinery (item 77), we are in no position to disturb the finding on the damages made by the trial judge.[16]

By the Sixth Point of its brief West Indies maintains that the finding of the trial court that plaintiff's accounting books and records were destroyed by the fire is based on evidence so palpably false and absurd that it is not reasonably worthy of credit.

On this point, the trial judge's finding was "plaintiff's accounting books were lost or burned in the disaster." Plaintiff's evidence was not specifically that they were burned, but that she was unable to recover them after the fire.

---

[16] Those amounts shall be deducted from the corresponding items and from the total of the damages awarded.

## Conclusion

West Indies and Francisco are solidarily liable for the damages sustained by Goenaga as a result of the fire in the sum of $130,951.04. Accordingly, the judgment rendered by the trial court in this case will be reversed as to that part relieving Miguel Francisco, and the complaint will also be sustained as to the latter; the judgment will be modified as to the pronouncement on damages, reducing the same to the sum of $130,951.04; and Miguel Francisco and West Indies Trading Corporation are solidarily ordered to pay solidarily to Conchita de Goenaga the said sum for damages, with costs, and the sum of $10,000 awarded for attorney's fees.

